# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CT-02133-SCT

*DAVID TREJO*

*v.*

*STATE OF MISSISSIPPI*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 12/12/2008 |
| TRIAL JUDGE: | HON. SAMAC S. RICHARDSON |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY:  HUNTER NOLAN AIKENS |
| | LESLIE S. LEE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED.  THE JUDGMENT OF THE CIRCUIT COURT OF MADISON COUNTY IS REVERSED AND RENDERED - 12/15/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.    In this certiorari case, the Court of Appeals reversed David Trejo's conviction and

sentence for possession of a controlled substance with intent to distribute, finding the State

had violated David Trejo's Fourth Amendment right against unreasonable seizure. The Court of Appeals held that the arresting officer lacked probable cause or reasonable suspicion to make the traffic stop[1] that led to the discovery of cocaine; thus, the trial court should have suppressed the cocaine as fruit of the poisonous tree. While we agree that the officer lacked probable cause or reasonable suspicion to stop Trejo's vehicle, we review the case to determine whether the stop was reasonable under the community caretaking function first pronounced in *Cady v. Dombrowski*.[2] Finding the stop unreasonable under that doctrine too, we affirm the Court of Appeals' reversal of Trejo's conviction and sentence.

**Facts**

¶2.     Officer Chris Picou was traveling North on I-55 at approximately 1:17 a.m. when he came upon a red Chevrolet SUV with a Texas license plate traveling in the left-hand or inside lane. The SUV was traveling approximately 58-60 miles per hour in an area where the minimum posted speed limit is 45 miles per hour and the maximum is 70 miles per hour. Picou was traveling 70 miles per hour in the left-hand lane behind Trejo when he flashed his bright lights for the SUV to move over so that he could pass. When the driver failed to change lanes, Picou flashed his brights two more times, with ten seconds passing between each flash. After the third flash,[3] Picou initiated his blue lights, and the driver immediately pulled onto the interstate shoulder.

---

[1]It is undisputed that the Fourth Amendment applies to vehicle stops. *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 114 (Miss. 1999) (citations omitted).

[2]*Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973).

[3]Picou flashed his bright lights between mile markers 114 and 115.

¶3.    Picou testified that he pulled over the SUV because he was concerned the driver was intoxicated or tired.  Picou testified that he did not stop the SUV based on any traffic violation.  Picou also testified there was no traffic in the right lane which would have prevented him from passing the SUV.

¶4.    When Picou approached the vehicle, he noticed that the driver, David Trejo, did not have slurred speech but appeared tired, glassy-eyed, and nervous.  His female passenger, Pebbles Nutt, seemed groggy.  Picou also noticed that the car smelled strongly of fabric softener, which in his experience[4] is used to cover the odor of controlled substances.  He then requested Trejo's driver's license and checked his criminal history, which revealed previous convictions for possession of a controlled substance.

¶5.    When Picou questioned Trejo about his criminal history, Trejo reported only a conviction for stealing an automobile.  Picou also ascertained that Trejo was traveling from Houston, a "source city" for drugs, to Ohio, a "source area" for distribution of drugs.  Picou then asked for permission to search Trejo's vehicle for controlled substances, and Trejo denied permission.  Picou informed Trejo that he was going to run a dog around the vehicle, and requested that Trejo and Nutt stand away from the vehicle.  When Nutt exited the car, she quickly turned her back to Officer Trejo, which further aroused his suspicion.  Picou instructed Nutt to turn around to make sure she had no weapons, and when she did, he saw a large bulge under her clothing at her midsection.  With the back of his hand, Picou felt the

---

[4]Picou had nineteen years of law enforcement experience, and his official title is "master sergeant in the Narcotics Division."

bulge. He immediately recognized that Nutt had strapped a controlled substance to her body, and he recovered two kilograms of cocaine.

¶6.     Trejo was indicted and found guilty of possessing cocaine with intent to sell in violation of Mississippi Code Section 41-29-139 and sentenced to sixty years as a habitual offender. Prior to trial, Trejo filed a motion to suppress the cocaine, which the trial court denied. The trial court found that Trejo was stopped for "safety reasons," namely "to check for the impairment of the driver, whether it was alcohol or sleep deprivation or what[ever] else[,]" to prevent an accident.

### Court of Appeals' Opinion

¶7.     Trejo appealed his conviction and sentence, arguing the circuit court erred in denying his motion to suppress.[5] The Court of Appeals did not address the circuit court's finding that this case involved a "safety" stop, as opposed to an "investigatory stop."[6] Rather, the Court of Appeals found that the initial traffic stop was an "investigatory stop" and looked to *Terry v. Ohio*[7] to complete its analysis.[8] The Court of Appeals determined that, since Picou's "suspicion that Trejo was tired or impaired is not sufficient to constitute a reasonable basis for the traffic stop[,]" then "there was no probable cause or reasonable suspicion to justify

---

[5] *Trejo v. State*, 2010 WL 2271518, *2 (Miss. Ct. App. June 8, 2010).

[6] We note the Court of Appeals erroneously referred to *Couldery v. State*, 890 So. 2d 959 (Miss. Ct. App. 2004), as a decision of this Court. *Id.* at * 4.

[7] *Terry v. Ohio*, 393 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[8] *Trejo*, 2010 WL 2271518, at *3.

4

the initial traffic stop . . . ."[9]  The Court of Appeals then concluded that the cocaine was "fruit of the poisonous tree[,]" without which "there is no remaining evidence to uphold Trejo's conviction."[10]  It reversed and rendered a judgment of acquittal for Trejo.[11]

**Discussion**

¶8.    Aggrieved by the Court of Appeals' decision, the State filed a petition for certiorari with this Court.  Although we conclude, as did the Court of Appeals, that there was no probable cause or reasonable suspicion of criminal activity to justify the stop, we ordered additional briefing to address the community caretaking function in light of the trial court's finding that Picou had performed a "safety" stop.

¶9.    The United States Supreme Court first applied the community caretaking function in *Cady v. Dombrowski*.[12]  In that case, the Supreme Court upheld the search of an impounded automobile after its driver, an off-duty police officer, was arrested for drunk driving after reporting an accident.[13]  The  police searched the vehicle without a warrant to look for the off-duty officer's service revolver and found evidence of another crime.[14]  The off-duty officer moved to suppress the evidence, but the Court upheld the search, reasoning:

---

[9]*Id.* at **1, 4.

[10]*Id*. at **3, 6.

[11]*Id.* at *6.

[12]*Cady v. Dombrowski*, 413 U.S. 433, 436, 448, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973).

[13]*Id.*

[14]*Id.* at 437.

5

> [S]tate and local police officers, unlike federal officers, have much more contact with vehicles for reasons related to the operation of vehicles themselves. All States require vehicles to be registered and operators to be licensed. States and localities have enacted extensive and detailed codes regulating the condition and manner in which motor vehicles may be operated on public streets and highways.
>
> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as *community care-taking* functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.[15]

The Court found the search reasonable, as the police were "simply reacting to the effect of an accident–one of the recurring practical situations that results from the operation of motor vehicles and with which the local police must deal every day."[16] Furthermore, the Court noted that it was reasonable for the officers to search the vehicle to recover the revolver "for the safety of the general public who might be endangered if an intruder removed a revolver" from the vehicle.[17]

---

[15]*Id.* at 441; *see also* **Colorado v. Bertine**, 479 U.S. 367, 371, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987) (finding police engaged in caretaking duties in inventory search of a lawfully impounded vehicle); **South Dakota v. Opperman**, 428 U.S. 364, 372-75, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976) (finding inventory search reasonable because police caretaking procedures are designed to secure and protect vehicles and their contents).

[16]**Cady**, 413 U.S. at 446.

[17]*Id.* at 447.

¶10. The State argues that this Court should adopt the community caretaking function, as Picou was acting in his duty to protect the public's safety when he stopped Trejo's vehicle. It argues Picou reasonably developed suspicion of criminal activity after effecting the stop.

¶11. Conversely, Trejo argues the Supreme Court has used the community caretaking function only in support of inventory searches of impounded cars. Trejo argues we should not extend the function to create a new or separate exception to the warrant requirement. He also argues that the stop does not meet the community caretaking function even if we adopt and apply it in this case.

¶12. Numerous jurisdictions have applied the community caretaking function beyond the context of *Cady* to instances such as the present. And this Court recognized the doctrine in *Floyd v. City of Crystal Springs*.[18] In that case, we were confronted with an officer's stop of a vehicle based solely on a citizen complaint of reckless driving.[19] The officer stopped the driver and found an opened bottle of vodka on the seat and arrested the driver for driving under the influence.[20]

¶13. In *Floyd*, the State argued this Court should evaluate the stop under the following standard: "'[W]hen police cross a threshold not in their criminal investigatory capacity, but as part of their *community caretaking* function, it is clear that the standard for assessing the Fourth Amendment propriety of such conduct is whether they possessed a reasonable basis

---

[18] *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 114-15 (Miss. 1999).

[19] *Id.* at 112.

[20] *Id.* at 112-13.

7

for doing what they did.'"[21] While we acknowledged the community caretaking function in that case, we ultimately upheld the stop as reasonable under the reasonable-suspicion standard.[22]

¶14.   We find "no reasoned argument in support of a *categorical* refusal to apply the community caretaking exception to vehicle stops[,]"[23] and we conclude that the community caretaking function in **Cady** may apply in contexts other than inventory searches, as the police provide many functions apart from investigating criminal activity.  But only "[u]nder appropriate circumstances [may] a law enforcement officer . . . be fully justified in stopping a vehicle to provide assistance, without needing any reasonable basis to suspect criminal activity."[24]  In applying the community caretaking function, "[t]he ultimate standard . . . is reasonableness."[25]  We review the determination of reasonableness under a de novo standard, but review findings of historical fact for clear error.[26]  As with other Fourth Amendment analyses, this Court will not try to determine the subjective intent of the person making the stop but will examine whether the stop is objectively reasonable.[27]  In doing so, we look to

---

[21]*Id.* at 117 (quoting **State v. Alexander**, 721 A.2d 275, 284-85 (Md. Ct. Spec. App. 1998)).

[22]*Id.* at 118.

[23]**People v. Madrid**, 85 Cal. Rptr. 3d 900, 906 (Cal. Ct. App. 2008).

[24]**State v. Brown**, 509 N.W.2d 69, 71 (N.D. 1993).

[25]**Cady**, 413 U.S. at 439.

[26]**Floyd**, 749 So. 2d at 113.

[27]*See generally* **Brigham City, Utah v. Stuart**, 547 U.S. 398, 404, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) (Court ruling that it had "repeatedly rejected" considering an officer's subjective intent and that "subjective motivation is irrelevant").

whether the stopping officer can point to "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant'" the stop.[28] The question becomes whether a reasonable person, "given the totality of the circumstances, would believe [the individual] *is in need of help*"[29] or that the safety of the public is endangered.[30] However, courts must carefully analyze the totality of the circumstances, so that the community caretaking function is "'cautiously and narrowly applied in order to minimize the risk that it will be abused or used as a pretext for conducting an investigatory [stop and] search for criminal evidence.'"[31]

¶15.   We begin our analysis by noting that at least two other jurisdictions applying the community caretaking function have concluded that stops effected under similar circumstances were unreasonable.[32] Likewise, upon reviewing the totality of the

---

[28]***Gonzales v. State***, 963 So. 2d 1138, 1142 (Miss. 2007) (citing ***Terry v. Ohio***, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).

[29]***Corbin v. State***, 85 S.W.3d 272, 276 (Tex. Crim. App. 2002) (quoting ***Wright v. State***, 7 S.W.3d 148, 151 (Tex. Crim. App. 1999)).

[30]*See* ***Cady***, 413 U.S. at 447.

[31]***State v. Rinehart***, 617 N.W. 2d 842, 844 (S.D. 2000) (quoting ***Com. v. Waters***, 456 S.E.2d 527, 530 (Va. App. 1995)).

[32]*See* ***Rowe v. Maryland***, 769 A.2d 879 (Md. 2001) (stop unreasonable where defendant was driving at 1:00 a.m. in far right lane of interstate at 50-54 miles per hour where speed limit was 65 and defendant's car had crossed white edge-line onto shoulder); ***Corbin v. State***, 85 S.W.3d 272 (Tex. Crim. App. 2002) (stop unreasonable where defendant was driving 52 miles per hour in 65 miles-per-hour zone at 1:00 a.m. near intersection of interstate and highway, and defendant's car crossed onto shoulder of road for less than one second). *But see* ***State v. Martinez***, 615 A.2d 279 (N.J. Super. Ct. App. Div. 1992) (stop reasonable where defendant was traveling less then 10 miles per hour on a 25 miles-per-hour residential street at 2 a.m.); ***State v. Rinehart***, 617 N.W.2d 842 (S.D. 2000) (stop reasonable where defendant was traveling at 1:05 a.m. on a deserted street going 20-25 miles per hour

9

circumstances in this case, we find the trial judge erred in finding the stop was reasonable under the Fourth Amendment. We are unable to conclude that a reasonable person would have believed Trejo was in need of help or that the public was endangered.

¶16. Because of the risk of danger to a driver as well as the traveling public, we agree that it would be reasonable for a police officer to stop an individual who appears to be falling asleep while driving. However, the facts presented here simply do not support such an inference. There was *no evidence* of erratic driving. Trejo was traveling approximately 10-12 miles per hour below the maximum speed limit of 70 miles per hour and well above the minimum speed limit of 45 miles per hour in the left-hand lane around 1:00 a.m. We do not think his speed was so slow that a reasonable person would believe it indicative of distress. We also do not find that Trejo's failure to change lanes after Picou flashed his bright lights was necessarily indicative of distress, nor was it so when considered with the other facts. Picou flashed his bright lights in quick succession on a deserted stretch of interstate. And no traffic prevented Picou from passing Trejo in the right lane. We find the following analysis by the Court of Appeals especially relevant:

> Trejo was not weaving or driving erratically, and there is no indication that Trejo was even aware that he was being followed by law enforcement . . . . This lack of awareness is supported by the fact that when Officer Picou turned on his flashing blue lights, Trejo promptly pulled over to the side of the road.[33]

---

where speed limit was 40 miles per hour); ***Ortega v. State***, 974 S.W.2d 361 (Tex. Ct. App. 1998) (stop reasonable where defendant was driving "[i]n the early morning hours" a 1979 Ford Bronco at 18-20 miles per hour in a 50 miles-per-hour zone).

[33] ***Trejo,*** 2010 WL 2271518, at *4.

10

Therefore, we find that the facts presented at the suppression hearing do not justify a reasonable belief that Trejo needed help or that the public was endangered, and as such, the trial court should have granted Trejo's motion to suppress.

**Conclusion**

¶17.   In applying the community caretaking function to the facts of this case, we find the trial court erred in denying Trejo's motion to suppress the cocaine as evidence.  As noted by the Court of Appeals, "[w]ithout the cocaine, there is no remaining evidence to uphold Trejo's conviction."[34]  Therefore, we affirm the Court of Appeals' judgment to reverse and render Trejo's conviction and sentence.

¶18.   **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED.  THE JUDGMENT OF THE CIRCUIT COURT OF MADISON COUNTY IS REVERSED AND RENDERED.**

   **WALLER, C.J., AND CARLSON, P.J., CONCUR. KITCHENS, J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J.; DICKINSON, P.J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION.  RANDOLPH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY PIERCE, J.  CHANDLER AND KING, JJ., NOT PARTICIPATING.**

   **KITCHENS, JUSTICE, CONCURRING IN RESULT ONLY:**

¶19.   While I concur with much of the analysis and with the result reached by the plurality, I write briefly to express, with respect, my disagreement with the plurality's unequivocal adoption of the so-called community caretaking function as a standard to be employed by Mississippi courts  in determining whether police stops of motorists on public thoroughfares are reasonable in the context of established search and seizure law.

---

[34]*Id.* at *6.

¶20.    The plurality cites *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 113 (Miss. 1999), as having recognized the doctrine of community caretaking by police, yet notes that Floyd was decided under the reasonable suspicion standard. Plur. Op. at ¶13. It is important to emphasize that the community caretaking language in *Floyd* was mere dicta, and in no way adopted this judicial contrivance as a standard that should apply to police stops of motorists.

¶21.    Moreover, it is important to note that the facts in *Cady v. Dombrowski,* 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d (1973), on which the plurality relies in adopting the community caretaking function, are vastly different from those in the present case. In *Cady*, the defendant was involved in a motor vehicle accident and telephoned police. *Id.* at 435-36. The responding officers picked up the defendant at the tavern from which he had placed the call, drove him back to the scene of the accident, and en route, noted that the defendant appeared intoxicated. *Id.* at 436. The defendant informed the officers that he was an off-duty policeman; and upon their arrival at the disabled vehicle, officers searched his car under the pretense of locating the defendant's service revolver. *Id*. No revolver was found, and the disabled vehicle was towed from the roadside to a privately owned garage. *Id.* The defendant was eventually arrested and charged with driving under the influence of alcohol and later was hospitalized due to injuries sustained in the accident. *Id.* Operating under standard departmental procedure, one of the arresting officers then performed an inventory search of the defendant's impounded vehicle, claiming to be looking for the service revolver. *Id.* at 437. The search of the vehicle and trunk revealed not the revolver but evidence and instrumentalities of an unrelated crime. *Id*.

¶22.    In finding that this was a reasonable search under the Fourth Amendment, the Supreme Court emphasized the following facts: the vehicle was disabled by an accident, the driver was intoxicated and unable to make arrangements to move the vehicle, the vehicle's presence alongside the highway was a nuisance, the police had a form of custody over the vehicle after its having been towed to the garage, the search of the vehicle for the revolver was an exercise in public safety to prevent the defendant's service revolver from falling into the wrong hands, and the search of an impounded vehicle was standard procedure for the police department. *Id.* at 442-43. These facts are wholly distinguishable from the present case, in which Officer Picau made a traffic stop of a functional vehicle based upon a mere suspicion that Trejo was either intoxicated or drowsy. In the instant case, there was no accident requiring Picau's assistance, there was no disabled vehicle on a roadside, and there was no standard-procedure, inventory search of an impounded vehicle.

¶23.    The plurality states: "[W]e conclude that the community caretaking function in *Cady* may apply in contexts other than inventory searches, as the police provide many functions *apart from investigating criminal activity*." Plur. Op. at ¶ 14 (emphasis added). However, the present case was not an instance in which a peace officer was acting in a capacity apart from investigating criminal activity, since Officer Picau testified that, despite any indication (i.e., of a traffic violation, or erratic driving), he suspected Trejo of being either drowsy *or* intoxicated and made the stop to "check the status on" Trejo.

¶24.    The danger in expanding this community caretaking function to apply to governmental searches and seizures where traffic stops have been made in the interest of public safety is that officers who have no reasonable belief that there is an imminent threat of danger to the

13

driver or other members of the public will be empowered to make traffic stops of motorists who have not violated the law in any way. Thus, any imaginable activity a police officer subjectively thinks could possibly be dangerous–including acts the legislature has not seen fit to prohibit by law, such as cell phone use or eating a sandwich–will provide justification for a police stop. Indeed, it is the legislature's constitutional responsibility to decide whether such activities are to be deemed threats to public safety. It is not the role of this Court to legalize police stops of motorists who have neither committed some violation of established traffic law nor are threatened by some imminently dangerous situation.

¶25. The reasonableness of traffic stops should continue to be analyzed under traditional Fourth Amendment jurisprudence. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" under the Fourth Amendment. ***Whren v. U.S.***, 517 U.S. 806, 809-810, 116 S. Ct. 1769, 1772 135 L. Ed. 2d 89 (1996) (citations omitted). "An automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." ***Id.*** at 810 (citing ***Delaware v. Prouse***, 440 U.S. 648, 659, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); ***Pennsylvania v. Mimms***, 434 U.S. 106, 109, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977)).

¶26. No one, of course, reasonably could question a police officer's right–indeed, obligation–to stop a motorist when the officer ***reasonably*** perceives an ***imminent*** threat of harm to the motorist or other members of the public. Examples would include the officer's

observing lug nuts missing from a vehicle's wheel, an automobile traveling toward a washed-out bridge, or gasoline leaking from a car or truck.[35] In cases when such stop is challenged, the officer must establish to the satisfaction of a judge that his or her perception of imminent threat of harm was reasonable.

¶27. In the instant case, the officer conceded that, at the time of the stop, no probable cause existed that led him to believe a traffic violation had occurred. At the suppression hearing, Officer Picau testified that he had stopped Trejo on suspicion that Trejo *could be* fatigued or intoxicated, given that Trejo would not yield the left lane of travel to Picau. Picau testified that, while drivers are expected to obey traffic signs, such as those on multi-lane highways that direct slow-moving traffic to drive in the right lane, he admitted that he did not stop Trejo based on his failure to obey such a traffic sign. At no time was Trejo driving erratically, over the maximum speed limit, or under the minimum speed limit, and the record includes no evidence of any imminent threat of danger.

¶28. I add that it is not difficult to think of circumstances under which a peace officer may be justified in stopping and charging a motorist for prolonged presence in a far left, or inside, lane of a street or highway of four or more lanes. Mississippi Code Section 63-3-603(d) (Rev. 2004) reads, in pertinent part, as follows:

> Whenever any roadway has been divided into three (3) or more clearly marked lanes for traffic . . .

---

[35] Justice Randolph asks: "Can it fairly be argued that a police officer may not stop a delivery truck with an unsecured cargo door in the interest of public safety? A vehicle with an under-inflated tire? An RV with an unlatched hatch cover flapping in the breeze?" Since all of these illustrations unquestionably present threats of imminent danger, I am grateful to my esteemed colleague for providing additional support for my position.

15

Upon all roadways any vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing shall be driven in the right-hand lane then available for traffic, or as close as practicable to the right-hand curb or edge of the roadway, except when overtaking and passing another vehicle proceeding in the same direction or when preparing for a left turn at an intersection or into a private road or driveway.

Although we do not find in the present case a clear violation of Mississippi Code Section 63-3-603(d), today's decision should not be read to diminish the validity or importance of that statute, which, if violated, should be enforced. This statute plainly establishes that the far-inside lane is intended mainly for passing. In this case, even if Trejo had violated Section 63-3-603(d), the arresting officer articulated no awareness of this statute's existence, and, in any event, did not rely on it as justification for stopping the Trejo vehicle. If he had, this case might have been decided differently. Such a stop would have required this Court to interpret Section 63-3-603(d) in light of the facts presented.

¶29.    Accordingly, there exists no reasonable basis to justify the officer's stop of the Trejo vehicle, and thus, no probable cause. I agree with the plurality's decision to reverse and render the conviction and sentence for possession of a controlled substance with intent to distribute; however, I cannot join in its adoption of the community caretaking function as it applies to traffic stops by police.

**DICKINSON, P.J., JOINS THIS OPINION.**

16

**RANDOLPH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶30.    I concur with the adoption of the "community caretaking" doctrine, but dissent to the plurality's result, which does not apply it.  The plurality presents an excellent synopsis of the "community caretaking" doctrine and has crafted a clear, workable standard for its application.  Assessing the exercise of a "community caretaking" function on a case-by-case basis, by objective reasonableness under "the totality of the circumstances," is a sound approach according balance to the interests of public safety and individual Fourth Amendment protections.  (Plur. Op. at ¶ 14).

¶31.    Despite the plurality's balanced, common-sense approach, Justice Kitchens rejects the "adoption of the community caretaking function as it applies to traffic stops by police[,]" predicated upon "imaginable activity a police officer subjectively thinks could possibly be dangerous . . . ."[36]  (Kitchens Op. at ¶¶ 6, 11).  Justice Kitchens's opinion ignores the standard of objective reasonableness under the "totality of the circumstances" championed by the plurality and the United States Supreme Court.  (Plur. Op. at ¶ 14) (citing ***Brigham City, Utah v. Stuart***, 547 U.S. 398, 404, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) (rejecting the officer's subjective intent)).  Can it fairly be argued that a police officer may not stop a delivery truck with an unsecured cargo door in the interest of public safety?  A vehicle with an under-inflated tire?  An RV with an unlatched hatch cover flapping in the breeze?  Where is the constitutional violation or putative 42 United States Code Section 1983 claim in such

---

[36]Compare this to Winston Churchill's statement to Parliament that "[t]his is one of those cases in which the imagination is baffled by the facts."

cases? Although no imminent hazard may exist, if left unchecked, each could have dire consequences for the traveling public.[37] Whether one considers his scenarios or mine, all illustrate why a case-by-case examination of the applicability of "community caretaking" in a traffic-stop context is required. The appropriate inquiry by the trial court is whether the stop was objectively reasonable, given the totality of the circumstances surrounding the condition(s) observed by an officer, that the driver, occupants, or other members of the traveling public were endangered.

¶32. I part ways with the plurality only insofar as it concludes that the circuit court "erred" in finding that the subject traffic stop was "reasonable" because "the facts presented . . . do not justify a *reasonable belief* that Trejo needed help or that the public was endangered . . . ." (Plur. Op. at ¶¶ 1, 15-16) (emphasis added). The plurality's ultimate finding is undergirded by a presupposition of de novo review, despite the fact that "[i]n reviewing the denial of a motion to suppress, we must determine whether the trial court's findings, considering the totality of the circumstances, are supported by *substantial credible evidence*." *Delker v. State*, 50 So. 3d 300, 303 (Miss. 2010) (quoting *Moore v. State*, 933 So. 2d 910, 914 (Miss. 2006)) (emphasis added). The circuit judge received credible evidence to support his finding that the subject traffic stop was initiated "for safety reasons[,]" a distinct and separate undertaking from a Fourth Amendment seizure based upon probable cause or reasonable suspicion of criminal activity. Specifically, Picou presented the circuit court with "objective, specific, and articulable facts" from "a trained and experienced police officer[,]"

_____

[37]An imminent danger does not have to be of the moment, but rather "[a]bout to occur at any moment : Impending." Webster's II New College Dictionary 553 (2001).

informed by his "inference and deduction[,]" in support of his perception that the driver may need aid, as opposed to the suspicion of criminal activity. *State v. Marx*, 289 Kan. 657, 662, 215 P.3d 601 (2009); *State v. Bakewell*, 730 N.W.2d 335, 339 (Neb. 2007) (internal citations omitted). The circuit judge found that the traffic stop based thereon was objectively reasonable, in the interest of protecting both the driver and the safety of the general public.[38] *See People v. McDonough*, 239 Ill. 2d 260, 272, 940 N.E.2d 1100 (2010). *See also State v. Mitchell*, 498 N.W.2d 691, 694 (Iowa 1993) ("[t]he State has a valid interest in the safety of its citizens on its roads and highways."). As I would find that the circuit court did not err in concluding that Trejo was stopped "for safety reasons[,]" the "community caretaking" doctrine should apply to the subject traffic stop. Under "the totality of the circumstances," the circuit court's conclusion was "supported by substantial credible evidence." *Delker*, 50 So. 3d at 303 (quoting *Moore*, 933 So. 2d at 914). Accordingly, I conclude that the circuit court did not err in denying Trejo's "Motion to Suppress," premised upon the "safety" stop.

¶33. Because I would reverse the decision of the Court of Appeals and reinstate and affirm the ruling of the circuit court denying Trejo's "Motion to Suppress," I respectfully concur in adoption of the "community caretaking" doctrine, but dissent as to the result reached by the plurality.

**PIERCE, J., JOINS THIS OPINION.**

---

[38]Using exclusionary rule standards by way of analogy, how exactly did the "constable . . . blunde[r]" here? *Delker*, 50 So. 3d at 306 (quoting *People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926) (opinion of the Court by Cardozo, J.)).