[No. A118033. First Dist., Div. Five. Nov. 26, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
LUIS LOSADA MADRID, Defendant and Appellant.

COUNSEL

Martin Kassman, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Martin S. Kaye and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**SIMONS, J.**—In *Cady v. Dombrowski* (1973) 413 U.S. 433 [37 L.Ed.2d 706, 93 S.Ct. 2523] (*Dombrowski*), the United States Supreme Court recognized that a significant portion of police work is devoted to community caretaking

functions, where no criminal misconduct is under investigation. In the performance of such functions, evidence of a crime may be discovered and then challenged in court, requiring a determination of the applicability of the community caretaking exception to the warrant requirement.[1] In this case we examine a vehicle stop initiated by an officer who believed a passenger might have been ill. The stop disclosed evidence resulting in charges for narcotics offenses against the driver, appellant Luis Losada Madrid. Appellant argues the community caretaking exception has never been applied in California to permit a detention, and we should not expand it to approve warrantless vehicle stops. Alternatively, he contends that even if the exception could apply to some vehicle stops, the information available to the officer in this case was insufficient to justify the detention. We agree with appellant's second contention and reverse.

## BACKGROUND

The following evidence was presented at the hearing on appellant's motion to suppress. On February 17, 2007, Redwood City Police Officer Perez was patrolling in a marked police vehicle at the Sequoia Station shopping center. Around 3:00 p.m., Perez observed a man, later identified as Jeffrey Kendrick, walking with an "unsteady" gait and sweating. As Kendrick walked, he stumbled and broke his fall by holding onto a nearby empty shopping cart. Perez believed Kendrick "might be under the influence of alcohol, that he could have a medical problem, a victim of an assault, or under the influence of drugs." There were many other people and vehicles around at the time.

Kendrick walked approximately 50 feet to a parked red Toyota Corolla and entered on the passenger side. When the Toyota started to move, Perez drove over and parked his patrol vehicle in front of it, preventing the Toyota from driving away. Perez testified he blocked the Toyota because he "didn't want [the driver] to leave knowing that there could be something wrong with the passenger." The Toyota stopped, and Perez exited his vehicle and approached the passenger side of the Toyota "to check on [Kendrick's] well being." Perez noticed Kendrick was sweating, his pupils were dilated, and he was "nodding off," which Perez recognized as signs of the first stage of "opium with-

---

[1] The Fourth Amendment to the United States Constitution sets out the warrant requirement: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

drawal." He asked Kendrick and appellant for identification. Appellant said he did not have identification or a driver's license, but gave Perez his name and date of birth.

About three minutes after Perez first approached the Toyota, Redwood City Police Officer Treadway arrived on the scene. Perez then asked Kendrick and appellant if there were any weapons or drugs in the vehicle. Kendrick responded by retrieving several hypodermic needles from his pocket. When Kendrick reached for the hypodermic needles, his pant leg moved up and exposed a bulge in his sock. Perez asked him what was inside the sock, and Kendrick removed a fruit drink cap, which contained a piece of cotton that Perez suspected contained heroin residue. Appellant handed Treadway a Sav-on pharmacy bag containing packages of Sudafed and Allerfrin and a balloon. Based on his training and experience, Treadway suspected the balloon contained tar heroin. Kendrick informed Perez that appellant had offered him heroin in exchange for purchasing the over-the-counter drugs, which appellant could not purchase himself because he did not have identification. Appellant was subsequently arrested.

An information filed March 20, 2007, charged appellant with possession of precursors with intent to manufacture methamphetamine (Health & Saf. Code, § 11383, subd. (c)(1)) (count 1),[2] possession of heroin for sale (Health & Saf. Code, § 11351) (count 2), and transportation of heroin (Health & Saf. Code, § 11352) (count 3). The information further alleged three prior convictions within the meaning of Health and Safety Code section 11370.2, subdivision (a). Appellant pled not guilty and denied the prior convictions.

On April 18, 2007, appellant moved to suppress the evidence seized by the police pursuant to Penal Code section 1538.5. The prosecution opposed the motion, contending Perez's stop of appellant's vehicle was justified under the community caretaking exception. On May 3, 2007, the court denied the motion. The court found Perez "observed Kendrick to be kind of staggering around and either under the influence of alcohol or drugs or both. And then get into the vehicle. He also fell over the shopping cart, I guess, or leaned onto it or something to that effect." The court concluded that "it was

---

[2] The prosecutor stated at the May 7, 2007 proceedings that there was a mistake in the information as to count 1. The information as written charged appellant with violation of Health and Safety Code section 11383, subdivision (c)(1), but was intended to charge appellant with violation of Health and Safety Code section 11383.7, subdivision (b)(1), possession of ephedrine or pseudoephedrine with knowledge that it will be used to manufacture methamphetamine.

appropriate for . . . Perez to do a welfare check on Kendrick . . . and it ends up that [appellant] sort of gets caught up in the Kendrick investigation. [¶] I don't know what else . . . Perez should have or could have done."

On May 7, 2007, appellant waived his right to jury trial on the understanding that the prosecution would go forward only on count 2. The parties agreed to submit the matter for resolution by the trial court on the basis of the preliminary hearing transcript, stipulations, and certified copies of appellant's prior convictions. The court found appellant guilty on count 2 and found the prior conviction allegations true. Appellant was sentenced to the middle term of three years in state prison, and filed this timely appeal.

## DISCUSSION

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729].)

■ The Fourth Amendment prohibits detentions of persons by law enforcement if they are unreasonable. (*Terry v. Ohio* (1968) 392 U.S. 1, 19 [20 L.Ed.2d 889, 88 S.Ct. 1868].) A detention is reasonable under the Fourth Amendment if the detaining officer, at the time of the detention, "can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231 [36 Cal.Rptr.2d 569, 885 P.2d 982].)

The People do not contend Perez had a reasonable suspicion that appellant or Kendrick was involved in criminal activity at the time Perez stopped appellant's vehicle. Instead, the People argue Perez was justified in stopping the vehicle in the exercise of his community caretaking functions.

The community caretaking exception to the warrant requirement derives from the expanded role undertaken by the modern police force. As recognized in *Dombrowski*, "[b]ecause of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of

police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." (*Dombrowski, supra,* 413 U.S. at p. 441.)[3]

 In *People v. Ray* (1999) 21 Cal.4th 464 [88 Cal.Rptr.2d 1, 981 P.2d 928] (lead opn. of Brown, J.) (*Ray*), our high court adopted the reasoning of *Dombrowski* and extended it to the search of a home that appeared to have been burglarized. *Ray* noted that in addition to their investigative tasks, police officers regularly perform " 'community caretaking functions'—helping stranded motorists, returning lost children to anxious parents, assisting and protecting citizens in need." (*Id.* at p. 467.) *Ray* distinguished the warrant exception for exigent circumstances from the one for community caretaking and concluded the "emergency aid" doctrine was a subcategory of the latter. (*Id.* at p. 471.) The "emergency aid" component of the community caretaking exception "requires specific, articulable facts indicating the need for ' "swift action to prevent imminent danger to life or serious damage to property . . . ." [Citation.]' [Citation.]" (*Id.* at pp. 472–473.) In addition, "circumstances short of a perceived emergency may justify a warrantless entry, including the protection of property, as 'where the police reasonably believe that the premises have recently been or are being burglarized.' [Citation.]" (*Id.* at p. 473.) "The appropriate standard under the community caretaking exception is one of reasonableness: Given the known facts, would a prudent and reasonable officer have perceived a need to act in the proper discharge of his or her community caretaking functions? . . . '[I]n determining whether the officer acted reasonably, due weight must be given not to his unparticularized suspicions or "hunches," but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary.' [Citation.]" (*Id.* at pp. 476–477.)

---

[3] "The policeman, as a jack-of-all-emergencies, has 'complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses'; by default or design he is also expected to 'aid individuals who are in danger of physical harm,' 'assist those who cannot care for themselves,' and 'provide other services on an emergency basis.' " (3 LaFave, Search and Seizure (4th ed. 2004) § 5.4(c), pp. 201–202, fn. omitted, quoting 1 ABA Stds. for Crim. Justice (2d ed. 1980) com. to stds. 1-1.1(b), 1-2.2(c), (f), (k), pp. 1.10, 1.31 to 1.32.)

In *Ray*, police officers were dispatched to a residence after a neighbor reported that " 'the door has been open all day and it's all a shambles inside.' " (*Ray, supra*, 21 Cal.4th at p. 468.) The officers found the front door open about two feet, and the front room " 'appeared to be ransacked as if someone went through it.' " (*Ibid.*) The officers knocked repeatedly and loudly announced their presence, but received no response. They became increasingly concerned that persons inside might be injured or unable to call for help, or that a burglary had been committed or was in progress. The officers entered the residence and saw a large amount of suspected cocaine and money in plain view. (*Id.* at pp. 468–469.) In the lead opinion, Justice Brown, writing for three justices, upheld the warrantless entry under the community caretaking exception, reasoning that "[w]hile the facts known to the officers may not have established exigent circumstances or the apparent need to render emergency aid, they warranted further inquiry to resolve the possibility someone inside required assistance or property needed protection." (*Id.* at p. 478.) The concurring opinion by Chief Justice George, which also garnered three votes, upheld the search based upon the exigent circumstances exception as discussed in *People v. Duncan* (1986) 42 Cal.3d 91 [227 Cal.Rptr. 654, 720 P.2d 2], and made no mention of the community caretaking exception. (*Ray*, at pp. 480–482.)[4]

*Dombrowski* considered the police search of an impounded vehicle, and appellant contends that the community caretaking exception should not be expanded to permit the stop of a vehicle and the detention of the person or persons inside. We disagree. Though a vehicle stop would seem to be a more significant invasion of privacy than the inventory of an impounded vehicle, appellant presents no reasoned argument in support of a *categorical* refusal to apply the community caretaking exception to vehicle stops. Though no published California case has specifically addressed this question, a number of other states recognize that a police officer may utilize the community caretaking exception to justify the stop of a vehicle to ensure the safety of an occupant where the officer lacks a reasonable suspicion of criminal activity. (See, e.g., *State v. Moore* (Iowa 2000) 609 N.W.2d 502, 504; *State v. Vistuba*

---

[4] At least one commentator has concluded that the United States Supreme Court's decision in *Brigham City v. Stuart* (2006) 547 U.S. 398 [164 L.Ed.2d 650, 126 S.Ct. 1943] (*Brigham City*) "goes a considerable way toward collapsing any distinction between the . . . ' "emergency aid doctrine" ' and the exigent circumstances exception to the warrant requirement—at least in the significant subset of cases where exigency derives from the risk of physical harm to a person. In this subset of cases, law enforcement and 'community caretaking' functions have been officially married." (Tuerkheimer, *Exigency* (2007) 49 Ariz. L.Rev. 801, 812–813, fns. omitted.) If this assessment of *Brigham City* is correct, then the home entry in *Ray* was correctly analyzed under the exigent circumstances doctrine by the concurring opinion in that case.

(1992) 251 Kan. 821, 823–824 [840 P.2d 511, 514]; *State v. Pinkham* (Me. 1989) 565 A.2d 318, 319; *State v. Rinehart* (2000) 2000 SD 135 [617 N.W.2d 842, 844]; *Wright v. State* (Tex.Crim.App. 1999) 7 S.W.3d 148, 151 (*Wright I*); *State v. Marcello* (1991) 157 Vt. 657 [599 A.2d 357, 358]; 4 LaFave, Search and Seizure, *supra*, § 9.2(b), pp. 294–295, and cases cited therein.)

Finally, the United States Supreme Court has consistently confirmed that its analysis under the Fourth Amendment is always grounded on "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." (*Terry v. Ohio, supra*, 392 U.S. at p. 19; accord, *Dombrowski, supra*, 413 U.S. at p. 439.) And *Ray* concluded the community caretaking exception applies when police officers "acted reasonably to protect the safety and security of persons and property" (*Ray, supra*, 21 Cal.4th at p. 468), that is, when "a prudent and reasonable officer [would] have perceived a need to act in the proper discharge of his or her community caretaking functions" (*id.* at pp. 476–477). We are unwilling to adopt appellant's position that the reasonableness of a vehicle stop can never rest on the officer's perception that an occupant's welfare requires this action.

■ In any event, assuming that the community caretaking exception may justify the stop of a moving vehicle, we conclude that given the facts known to Perez a reasonable officer would not have perceived a need to do so in this case. "[R]easonableness 'depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers,"' [citation]." (*Maryland v. Wilson* (1997) 519 U.S. 408, 412 [137 L.Ed.2d 41, 117 S.Ct. 882].) In engaging in this weighing process, courts must act as vigilant gatekeepers to ensure that the community caretaking exception does not consume the warrant requirement. (See *Ray, supra*, 21 Cal.4th at p. 477.)

We find instructive the approach of the highest court of criminal appeals in Texas in *Wright I, supra*, 7 S.W.3d 148, and *Corbin v. State* (Tex.Crim.App. 2002) 85 S.W.3d 272. In *Wright I*, a deputy sheriff observed a passenger sitting in the rear seat of a moving vehicle, leaning out the rear window and vomiting. (*Wright I*, at pp. 149–150.) The deputy had not observed any criminal activity or traffic violations, but he stopped the vehicle " 'basically to make sure [the passenger] was not being assaulted and to see if he needed medical attention.' " (*Id.* at p. 150.) The deputy approached the vehicle and saw a marijuana cigarette in plain view; the passenger was charged with marijuana possession. (*Ibid.*) The court of criminal appeals acknowledged the community caretaking exception to the warrant requirement: "As part of his duty to 'serve and protect,' a police officer may stop and assist an individual

whom a reasonable person—given the totality of the circumstances—would believe is in need of help." (*Id.* at p. 151.) The court then set forth a nonexclusive list of factors relevant to whether a police officer acted reasonably in stopping an individual to determine whether he or she needed assistance: "(1) the nature and level of the distress exhibited by the individual; [¶] (2) the location of the individual; [¶] (3) whether or not the individual was alone and/or had access to assistance independent of that offered by the officer; and [¶] (4) to what extent the individual—if not assisted—presented a danger to himself or others." (*Id.* at pp. 151–152.)

On remand, the intermediate appellate court applied these four factors and held that the deputy did not act reasonably in stopping the vehicle. (*Wright v. State* (Tex.App. 2000) 18 S.W.3d 245.) The court reasoned that the passenger was "in the rear seat of a car that was being driven in a lawful manner on a public highway. [The passenger] appeared to be having some gastric distress, but in addition to the driver, the other passenger in the car could have aided and assisted appellant. Nothing indicated that [the passenger's] condition was any more serious than an upset stomach. None of the car's occupants indicated that they were in need of additional help. Nothing indicated that the deputy sheriff's assistance was necessary or that his help would add to the comfort or welfare of [the passenger]. Nothing supported a *reasonable* belief that [the passenger] was a danger to himself or to others." (*Id.* at p. 247.) The court also noted that although the deputy "articulated concerns about appellant's safety, the concerns expressed were unsupported by articulated, reasonable facts. The reasons for the stop given by the officer were unreasonably speculative and appear to be no more than an attempt through hindsight to justify the stopping and detaining of [the passenger]." (*Ibid.*)

In *Corbin*, the court of criminal appeals revisited and clarified the four *Wright I* factors: "Because the purpose of the community caretaking exception is to allow an officer to 'seize' and assist an individual whom he reasonably believes is in need of help, the first factor is entitled to the greatest weight. The greater the nature and level of distress exhibited, the more likely the police involvement will be a reasonable exercise of the community caretaking function. This is not to say that the weight of the first factor alone will always be dispositive. In fact, the remaining three factors help to give more definition to the first factor. A particular level of exhibited distress may be seen as more or less serious depending on the presence or absence of the remaining three factors." (*Corbin v. State, supra,* 85 S.W.3d at p. 277.)

■ The stop of appellant's vehicle fails the reasonableness test. Initially, we note the stop was based on the officer's observations of the *passenger.* Clearly the balance would weigh more heavily in favor of the officer's action if the officer believed the *driver* was in great distress; an extremely ill driver

is a danger not only to himself but to other members of the public as well. (See *Wright I, supra*, 7 S.W.3d at p. 158 (dis. opn. of Johnson, J.).)

Second, prior to the stop of appellant's vehicle, Kendrick had exhibited a low level of distress. The only facts Perez articulated as grounds for the detention were that Kendrick walked with an unsteady gait, at one point used a nearby shopping cart to steady himself to avoid falling, and appeared to be sweating. However, despite Kendrick's apparent unsteadiness, he was able to walk the 50 feet to appellant's vehicle without assistance and get in the passenger seat. Once in the vehicle, Kendrick was not alone, but had access to assistance from appellant. Neither Kendrick nor appellant indicated that they were in need of additional help, and nothing suggested appellant was unable to care for Kendrick or Perez's help would add to Kendrick's comfort or welfare. Furthermore, nothing about Kendrick's location (sitting in the passenger seat of a vehicle being driven lawfully though a shopping center parking lot) suggested Kendrick was in need of additional aid.

Finally, the facts do not support a reasonable conclusion that Kendrick presented a danger to himself or others. The People contend that "the officer's need [to stop appellant's vehicle] was substantial," because "[i]f Kendrick's condition was caused by the ingestion of drugs, the danger of an overdose was possible." However, an inference by Perez that Kendrick was suffering from a drug overdose, based merely on Perez's observations that appellant was walking with an unsteady gait and sweating, would have been unreasonably speculative.

We conclude that, given the known facts, a reasonable officer would not have perceived a need to stop appellant's vehicle to discharge his community caretaking functions.[5] (*People v. Ray, supra*, 21 Cal.4th at pp. 476–477.) Perez detained appellant in violation of the Fourth Amendment, and the court erred in denying appellant's motion to suppress the evidence seized by the police as a result of this illegal detention. (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 791 [195 Cal.Rptr. 671, 670 P.2d 325].)

---

[5] Appellant also contends that Perez's detention of him was not justified by the community caretaking exception because Perez's motivation for stopping the vehicle was not entirely divorced from law enforcement. Appellant relies on the lead opinion in *Ray*, which states, an " 'entry cannot be made on the pretext to search for contraband or illegal activity rather than to look for [burglary] suspects and to preserve an occupant's property. [Citation.]' [Citation.] . . . Any intention of engaging in crime-solving activities will defeat the community caretaking exception even in cases of mixed motives. [Citation.]" (*Ray, supra*, 21 Cal.4th at p. 477.) It appears that the high court has rejected this subjective analysis. (*Brigham City, supra*, 547 U.S. at pp. 404–405.) In light of our conclusion that the detention of appellant's vehicle was not a reasonable exercise of Perez's community caretaking functions, we need not reach this issue.

## DISPOSITION

The judgment is reversed.

Jones, P. J., and Needham, J., concurred.