Filed 5/31/13  In re T.M. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re T.M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>T.M.,<br><br>    Defendant and Appellant. | G045930<br><br>(Super. Ct. No. DL039669)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Jacki C. Brown, Judge.  Reversed with directions.

Patrick McKenna, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

\*       \*       \*

The juvenile court found 17-year-old T.M. was under the influence of methamphetamine, declared him a ward of the court and placed him on probation. Minor contends the court erroneously denied his motion to suppress evidence as the product of an unlawful search. For the reasons expressed below, we reverse with directions to grant minor's suppression motion.

I

FACTS AND PROCEDURAL BACKGROUND

The Orange County District Attorney filed a Welfare and Institutions Code section 602 petition alleging minor was under the influence of methamphetamine on October 30, 2010, in violation of Health and Safety Code section 11550, subdivision (a).

At the hearing on minor's suppression motion (Welf. & Inst. Code, § 700.1), Garden Grove Police Officer Bryan Meers testified he was dispatched to a residence on Stanford Avenue concerning an aborted 911 call. The dispatcher informed Meers the 911 caller identified herself as Laura Jean O'Barr and then "abruptly ended" the call. Garden Grove routinely sends its police officers to the location of the 911 call if a second attempt to contact the caller fails. The officer is directed to "make contact at the residence with anyone inside to assure that there is no foul play, anyone being harmed or there's no emergencies inside." Meers did not know if the call came from a landline or from a cell phone.

When Meers arrived at the residence, he approached a man standing in front of the house. The man, who declined to provide his name, stated he had been staying at the residence for two weeks. Meers asked the man if he had dialed 911 or if there was an emergency inside. The man replied, "No, but you're welcome to come in

2

and check," and he opened the front door for Meers. By this time, Meers' partner had arrived to assist in checking the residence.

Meers knew O'Barr from two or three previous contacts at the residence, so he went immediately to her room, located directly to the right of the front door. Meers knocked, which caused the door to open. He asked O'Barr if she called 911 and asked if everything was okay.[1]

Because O'Barr was bedridden with an illness, Meers concluded O'Barr "didn't have a very good idea as to who called 911 or what was going on at the residence." Meers therefore decided to "do a safety check on the rest of the residence to assure that" everything was all right. The residence contained "several makeshift rooms and other apartments." Meers went room by room, contacting approximately three other residents and asking about the 911 call and their welfare.

Meers encountered minor in one of two upstairs loft bedrooms, accessed by a side staircase off a backyard patio. Meers knocked at one of the rooms, but received no response. He came to the second room and knocked at the door. Someone inside opened the door, although Meers did not recall or record the person's name. Meers entered the room without asking permission or receiving an invitation to enter. He saw a small second bedroom about four feet by six feet, directly behind the first one.

Meers looked through the open door and spotted minor sitting on the bed. From Meer's vantage point, minor was 20 to 25 feet away and it "did not look like he

---

[1]    On direct examination, Meers testified he asked O'Barr if "she had called 911 and if there [were] any emergencies in the residence." O'Barr "stated she did not call 911 and she . . . actually asked me if everything was okay." On cross-examination, minor's counsel asked Meers if he "actually did have a talk with [O'Barr], and she confirmed she was the one who called." Meers stated "[t]hat is correct." Asked if it was true that "none of the information from the time you walked to the door or even the conversation with Ms. O'Barr" was in his police report, Meers stated he "only referred to it by stating that nothing seemed unusual."

was in distress." Meers and his partner "walked into the first room and then we walked into the second room." Meers testified that after he entered minor's room "[i]t was clear there was no emergency," but Meers asserted he "still had to speak with [minor]."

Meers asked minor about the 911 call and whether he was okay. Minor denied calling 911 and stated he knew of no problems at the residence. Meers noticed minor was sweating profusely, which was odd because it was not warm. Minor "seemed either nervous or like he was trying to not fully answer the question." He did not maintain eye contact and was "looking in all directions." His eyes were abnormally dilated. Meers felt it possible minor might be under the influence of a controlled substance, and asked minor if he was on probation or parole.

Meers asked minor to perform various field sobriety tests and he checked minor's pulse. Based on minor's performance on the sobriety tests and his pulse rate, Meers arrested minor for being under the influence of a controlled substance.

Alan M., minor's father, testified he had rented the upstairs unit for five years but was not present at the time of his son's arrest. His son had been visiting for three or four days. The front room of his unit is 8 feet by 20 feet. The back room, where the officers saw minor, is about 8 feet by 10 feet.

Minor testified he was playing guitar in the back room of his father's suite while his brother slept in the front room. Minor heard the officers arrive downstairs, went to the front room door, and saw the officers' flashlights outside. The officers came upstairs, saw minor, and "just walked" into the room through the open door. Minor was sitting on his father's bed. The officers looked around the room for a minute or so, walked past minor's sleeping brother, then came into the back room and stood shoulder-to-shoulder about two feet from minor, blocking the doorway. They first asked minor if he was on probation or parole, then tested minor with a flashlight. They never asked if he called 911 or told him why they were there.

4

The juvenile court denied minor's suppression motion. The court concluded the officers received consent to enter the residence, and possessed tacit or apparent authority from the landlord O'Barr to walk through the common areas. The court found the officers made observations through minor's door[2] and "would have had the responsibility to determine . . . if there was an emergency, whether – what nature of the emergency and whether the individuals within that street address were in need of help or response by the police."

The minor subsequently admitted the allegations of the petition. The court declared minor to be a ward of the court and placed him on supervised probation on various terms and conditions, including drug testing, counseling, and community service.

II

DISCUSSION

*The Juvenile Court Erred in Denying Minor's Suppression Motion*

Minor contends the officers violated his Fourth Amendment rights by entering his room without a warrant, consent, or other legal justification. To justify the entry into minor's room, the Attorney General relies on the community caretaking exception to the warrant requirement described in *Cady v. Dombrowski* (1973) 413 U.S. 433 (*Cady*) and the plurality opinion of *People v. Ray* (1999) 21 Cal.4th 464 (*Ray*), which applied Cady's holding to residential searches. We agree with minor the entry into his room was improper. Even assuming the rationale for applying the community caretaking exception remains viable, we conclude it does not apply under these circumstances.[3]

---

[2]     Meers testified the door to the front room was closed, he knocked, and someone opened it. Minor contended the front door was always open. The juvenile court assumed minor's door was open at the time Meers approached the unit.

[3]     The Attorney General does not defend the juvenile court's findings that (1) O'Barr consented (expressly or tacitly) to allow the officers to search the home, and (2) Meers observed minor's symptoms of methamphetamine use before he entered the minor's room. According to Meers, O'Barr "didn't have a very good idea as to who called 911 or what was going on at the residence," so *he decided* to "do a safety check on

The standard of appellate review on a suppression motion is well established. We defer to the juvenile court's express or implied factual findings if supported by substantial evidence, but with those findings in mind, we independently determine the legality of the search under Fourth Amendment principles. (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

Searches and seizures inside a home without a warrant are presumptively unreasonable. (*Brigham City v. Stuart* (2006) 547 U.S. 398 (*Brigham City*); *Payton v. New York* (1980) 445 U.S. 573, 586.) "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." (*Mincey v. Arizona* (1978) 437 U.S. 385, 393-394 (*Mincey*).) A limited exception to the warrant requirement arises when exigent circumstances create a "compelling need for official action and no time to secure a warrant." (*Michigan v. Tyler* (1978) 436 U.S. 499, 509 [law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause]; *United States v. Santana* (1976) 427 U.S. 38, 42-43 [to engage in hot pursuit of a fleeing suspect]; *Ker v. California* (1963) 374 U.S. 23, 40 [to prevent the imminent destruction of evidence, plurality opinion].)

The exigent circumstances exception to the warrant requirement is defined as "'an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property.'" (*People v. Duncan* (1986) 42 Cal.3d 91, 97.) Thus, officers may enter a home "to assist persons who are seriously injured or threatened with such injury." (*Brigham City*, *supra*, 547 U.S. at p. 403.) "'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal

_____

the rest of the residence to assure that" everything was all right. Meers also stated he entered minor's room without asking permission or by invitation. There was no evidence he observed minor perspiring or spotted his dilated pupils until after he entered the room.

6

absent an exigency or emergency.'" (*Mincey*, *supra*, 437 U.S. at pp. 392-393.) The test is an objective one and does not depend on the officers' subjective motivations. (*Brigham City*, *supra*, 547 U.S. at p. 404].) "[A]n important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 753 [exigency insufficient to justify warrantless entry of residence to arrest suspect for driving while intoxicated only to preserve evidence of the suspect's blood-alcohol level].)

The Attorney General does not rely on the exigent circumstances exception to justify the entry into minor's room; instead she relies on the community caretaking exception first recognized in *Cady*. There, the defendant reported to Wisconsin police officers that he had been in a single-car automobile accident. Officers took the intoxicated defendant to the hospital for treatment of his injuries and towed his car to a privately-owned garage. (*Cady, supra*, 413 U.S. at p. 436.) When officers learned the defendant was a Chicago police officer they searched his vehicle for his service revolver to prevent it from falling into "untrained or perhaps malicious hands." (*Id.* at p. 443.) The police found evidence of a murder in the trunk of his car. (*Id.* at p. 437.)

The Supreme Court upheld the vehicle search because it fell within a police officer's community caretaking function, a task "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." (*Cady, supra*, 413 U.S. at p. 441.) The court explained that states and local entities extensively regulate motor vehicles and traffic, and "because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office." (*Id.* at p. 441.) Thus, officers acted reasonably when they towed the defendant's disabled rental car to a private garage. The damaged vehicle was a nuisance along the highway, and the defendant, intoxicated and later comatose, was incapable of making arrangements to have the vehicle towed and stored. (*Id.* at p. 443.)

7

The search of the trunk was standard police procedure to protect the public from the possibility the defendant's gun would fall into the wrong hands. (*Ibid.*)

*Cady* emphasized the constitutional distinction between the search of an automobile and a residence, explaining "'cars that are constantly movable may make the search of a car without a warrant a reasonable one although the result might be the opposite in a search of a home, a store, or other fixed piece of property." (*Cady, supra*, 413 U.S. at p. 440.) The court attributed "[t]he constitutional difference between searches of and seizures from houses and similar structures and from vehicles stems both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband." (*Id.* at p. 442.)

In *Ray,* a plurality of Justices Brown, Baxter, and Kennard extended *Cady's* community caretaker exception to uphold the search of a home that appeared to have been burglarized. Police officers responded to a residence after a neighbor reported the front door had been open all day and the interior was "'a shambles.'" (*Ray, supra*, 21 Cal.4th at p. 468.) The officers found the front door open about two feet and it appeared as if the front room had been ransacked. The officers knocked several times and loudly announced their presence, but received no response. Believing a burglary might be in progress and concerned about the welfare of the residents, officers entered the dwelling. They found no one inside, but observed a large quantity of cocaine and money in plain view. (*Id.* at p. 468-469.)

The plurality opinion rejected the Attorney General's reliance on exigent circumstances to support the warrantless entry. (*Ray, supra*, 21 Cal.4th at p. 471.) The plurality explained the officers lacked specific, articulable facts showing the need to swiftly enter the residence to prevent imminent danger to life or property. (*Id*. at p. 472.) Nevertheless, the plurality upheld the warrantless search as part of the officers' community caretaking responsibilities. (*Id*. at p. 473.) Under this distinct exception,

8

"circumstances short of a perceived emergency may justify a warrantless entry" so officers may "resolve the situation." (*Ibid.*)

The plurality further explained the officer must have specific and articulable facts demonstrating the need to act in discharging the officer's community caretaking functions. (*Ray, supra*, 21 Cal.4th at p. 477.) The plurality warned that not "every open door – even in an urban environment – will justify a warrantless entry to conduct further inquiry." (*Ibid.*) To maintain "the essential constitutional balance," the authority to enter a residence to render emergency aid is "narrowly delimited by the known facts" and does not justify a search for other purposes. (*Ibid.*) Rather, "'the warrantless search of a dwelling must be suitably circumscribed to serve the exigency which prompted it.'" (*Ibid.*) To guard against "'subterfuge,'" the opinion directed trial courts to examine the officers' "motivations." (*Ibid.*) "Any intention of engaging in crime-solving activities will defeat the community caretaking exception, even in cases of mixed motives." (*Ibid.*)

Chief Justice George, joined by Justices Werdegar and Chin, upheld the search based on the traditional understanding of the exigent circumstances doctrine, but did not discuss the plurality's community caretaking analysis. The opinion explained, "[e]xigent circumstances existed, because the officers had reasonable cause to believe a burglary was in progress, or that a burglary had been committed and there might be persons inside the residence in need of assistance." (*Ray, supra*, 21 Cal.4th at p. 482.) In his dissent, Justice Mosk concluded no exigency existed and rejected the creation of a community caretaking exception allowing entry into a residence.

Minor argues we are not bound by the *Ray* plurality opinion and instead should follow those federal circuit opinions rejecting the application of the community caretaking exception to residential searches. True, the majority of circuits have limited *Cady's* community caretaking doctrine to automobile searches. (*Ray v. Township of Warren* (3d Cir. 2010) 626 F.3d 170, 175-176 [*Cady* did not intend the community

9

caretaking doctrine to justify the warrantless search of a home]; *United States v. Bute* (10th Cir. 1994) 43 F.3d 531, 535 [community caretaking doctrine not applicable to search of manufacturing plant]; *United States v. Erickson* (9th Cir. 1993) 991 F.2d 529, 531-532 [*Cady's* community caretaking exception "clearly turned on the 'constitutional difference' between searching a house and searching an automobile"]; *United States v. Pichany* (7th Cir. 1982) 687 F.2d 204, 207-209 [Supreme Court did not intend to create a broad exception to warrant requirement whenever police investigate under their caretaking functions].) There is a separate reason, however, to question the viability of *Ray's* community caretaking rationale, which created a new and distinct exception to the warrant requirement. The United States Supreme Court's decision in *Brigham City* appears to have eroded the theoretical foundation on which the *Ray* plurality relied.

In *Brigham City*, four police officers responded to a 3:00 a.m. call regarding a loud residential party. When officers heard shouting from inside the residence they entered the backyard and spotted through the screen door four adults restraining a juvenile, who broke free of their grasp and struck an adult in the face. The other adults continued to struggle with the juvenile while the victim of the blow spit blood into the sink. The officers entered the residence and arrested the participants, who were charged with disorderly conduct, intoxication, and contributing to the delinquency of a juvenile. (*Brigham City, supra*, 547 U.S. at pp. 400-401.)

Entry into the residence arguably falls under the emergency aid doctrine, which the *Ray* plurality considered a subcategory of the community caretaking exception. To ensure the officers who arrived on the scene acted as community caretakers when quelling the disruption and nuisance of a loud neighborhood party, the *Ray* plurality's analysis would require an examination of the officers' motivations because "[a]ny intention of engaging in crime-solving activities will defeat the community caretaking exception even in cases of mixed motives." (*Ray*, *supra*, 21 Cal.4th at p. 477.)

10

The Supreme Court rejected this analytical approach. The court declined to examine the intent and motivations of the officers because the court found the entry objectively reasonable. (*Brigham City, supra*, 546 U.S. at p. 404.) The court explained it "does not matter here –even if their subjective motives could be so neatly unraveled – whether the officers entered the kitchen to arrest respondents and gather evidence against them or to assist the injured and prevent further violence." (*Id.* at p. 405.) The court concluded "the officers had an objectively reasonable basis for believing both the injured adult might need help and that the violence in the kitchen was just beginning." (*Id.* at p. 406.)

Before *Brigham City*, courts tended to divide traditional crime-solving police investigations from community caretaking functions. The *Ray* plurality emphasized this distinction in applying the community caretaking exception. (*Ray*, *supra*, 21 Cal.4th at p. 471 ["'[t]he defining characteristic of community caretaking functions is that they are totally unrelated to the criminal investigation duties of the police'"].) This distinction may no longer be valid after *Brigham City*. As one commentator has observed, *Brigham City* "goes a considerable way toward collapsing any distinction between what the court referred to as 'the so-called "emergency aid doctrine"' and the exigent circumstances exception to the warrant requirement –at least in the significant subset of cases where exigency derives from the risk of physical harm to the person. In this subset of cases, law enforcement and 'community caretaking' have been officially married. Similarly, to the extent that 'exigent circumstances' and 'emergency' were previously viewed as corresponding to a binary differentiation of law enforcement and community caretaking, respectively, this doctrinal divide has also eroded." (Tuerkheimer, *Exigency* (2007) 49 Ariz. L.Rev. 801, 812-813.) This reading of *Brigham City* would remove the theoretical basis supporting the *Ray* plurality. As the court in *People v. Madrid* (2008) 168 Cal.App.4th 1050, 1057, fn. 4 (*Madrid*) observed,

11

"[i]f this assessment of *Brigham City* is correct, then the home entry in *Ray* was correctly analyzed under the exigent circumstance doctrine by the concurring opinion in that case."

Resolution of this issue will have to await another day, however. Because the entry into minor's room failed to meet the requirements for applying the community caretaking exception announced by *Ray's* plurality, we need not determine whether residential searches performed as part of an officer's community caretaking functions should now be analyzed under the traditional exigent circumstances exception to the warrant requirement.

In turning to whether the community caretaking exception justified Meer's entry into minor's room, we are guided by the analysis in *Madrid*. There, a patrol officer stopped the defendant's truck after observing his passenger walking unsteadily and perspiring as he approached and entered the truck. (*Madrid, supra*, 169 Cal.App.4th at p. 1053.) The officer believed the passenger might be under the influence of alcohol or drugs, have a medical problem, or be the victim of an assault. The officer approached the truck and observed the passenger had dilated pupils and was "'nodding off.'" Further investigation led to the defendant's arrest on possession of drugs. (*Id*. at pp. 1053-1054.)

The *Madrid* court concluded "a reasonable officer would not have perceived a need to stop [defendant's] vehicle to discharge his community caretaking functions." (*Madrid, supra*, 168 Cal.App.4th at p. 1060.) The court explained the passenger displayed a low level of distress, neither the defendant nor the passenger indicated they desired additional help, the passenger's appearance did not suggest he needed help, and the defendant was available to assist the passenger if needed. (*Ibid*.) *Madrid* based its analysis on four nonexclusive factors relevant to whether the officer acted within the community caretaking exception: "'(1) the nature and level of the distress exhibited by the individual; [¶] (2) the location of the individual; [¶] (3) whether or not the individual was alone and/or had access to assistance independent of that

12

offered by the officer; and [¶] (4) to what extent the individual . . . presented a danger to himself or others'" if not assisted.  (*Id*. at p. 1059.)

Here, minor exhibited no distress when the officer stood outside his room; indeed, Meers conceded as much.  Under *Madrid*, this factor is entitled to the greatest weight.  (*Madrid, supra,* 168 Cal.App.4th at p. 1059.)  Minor's location was his residence, which is entitled to greater constitutional protection from state intrusion.  Another person was in the adjoining room and could have provided minor assistance if needed, and minor did not appear to present a danger to himself or others.  The level of distress and the need for police intervention here was far less than those circumstances found inadequate in *Madrid*.

We therefore conclude the prosecution failed to show specific and articulable facts justifying entry into minor's room.  Accordingly, we reverse the juvenile court's order denying minor's suppression motion.[4]

---

[4] The juvenile court relied on *People v. Corrao* (1962) 201 Cal.App.2d 848 (*Corrao*) in denying minor's suppression motion.  There, the appellate court held the defendant's landlady had authority to admit police officers to the common areas of a rooming house.  While in the common area hallway, the officer encountered the defendant and determined he was under the influence of a controlled substance.  When the defendant retreated to his room, the officer pursued him, and discovered drugs and other evidence of crime.  The court rejected as frivolous the defendant's contention the officer should have stopped after observing him in the hallway and requested a warrant to search his room.  (*Id.* at p. 853.)  "Obviously, defendant's first impulse, on seeing the officers, was to get rid of the incriminating contraband.  To require the officers to leave the area and obtain a search warrant would be to negative the efficacy of their efforts.  Furthermore, it is well settled in California that no warrant need be obtained in order to conduct a reasonable search incident to a valid arrest."  (*Ibid.*)  Here, the officers did not encounter minor in the common areas, and did not form the conclusion he was under the influence of methamphetamine until after they entered his room.  Accordingly, *Corrao* did not authorize the officer's search in this case.

## III

### DISPOSITION

The juvenile court's order denying minor's motion to suppress evidence is reversed.  The court is directed to grant the motion.


ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.