Filed 3/12/24  P. v. Cain CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID LOUIS CAIN,<br><br>    Defendant and Appellant. | D081041<br><br><br><br>(Super. Ct. No. SCE405288) |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson and Selena D. Epley, Judges.  Affirmed.

Patrick Dudley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Donald W. Ostertag and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury convicted David Louis Cain on two counts of possession of heroin for sale (Health and Saf. Code § 11350, subd. (a)–counts 1 and 5);[1] one count of possession of methamphetamine for sale (§ 11378–count 2); and two counts of possession of methamphetamine (§ 11377, subd. (a)–counts 3 and 4). The charges stemmed from three separate instances. In two of the three instances, police officers found Cain passed out in a vehicle and initiated contact to ensure that he was not overdosing or otherwise in need of medical attention. In each instance, after Cain regained consciousness, the officers asked him for identification, discovered that he had a Fourth Amendment waiver, and conducted a search of the vehicle based on the waiver.

On appeal, Cain asserts that the trial court erred in denying his motion to suppress evidence obtained during one of those searches, and by instructing the jury to continue deliberating after they informed the court they were having trouble reaching an agreement on counts 2 and 3. We are not persuaded by either argument and affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The January 27, 2021 Encounter*

At approximately 10:00 a.m. on January 27, 2021, the El Cajon Police Department received a call regarding two individuals, a male and a female, passed out in the back of a car on Chaney Street. Police Officer Evan Garner was in the area and responded to the call. Officer Garner was familiar with the area and knew that there was a specific house nearby that was known for selling narcotics.

---

1   All further unspecified statutory references are to the Health and Safety Code.

2

Officer Garner arrived on the scene and located a vehicle matching the reported description—a maroon Camry. He parked his vehicle "a fair distance away," approximately 20 feet, behind the Camry and began walking towards it. As he was doing so, his partner arrived on the scene in a separate marked vehicle and parked "a fair distance from the front of the vehicle." They did not turn on their sirens and did not box the Camry in.

As Officer Garner approached the Camry, he saw two individuals passed out in the backseat, slumped over. He believed they were both possibly under the influence of a controlled substance, and that they had used that substance to the point of passing out and possibly overdosing. Officer Garner knocked on the window and Cain woke up, but "it wasn't an immediate, like startled kind of awake." Rather, Cain was slow in his movements. Based on Cain's sluggish and lethargic movements, Officer Garner continued to believe that Cain was possibly under the influence of a controlled substance.

Cain opened the door and Officer Garner "just kind of let him [Cain] know what we [were] doing." Cain continued to be "sluggish in his movements." He looked towards the floorboard and then put both hands between his legs and started moving downward towards the floorboard. Officer Garner noticed "a little bag in the area," where Cain was looking and said, " 'Let's keep your hands in sight,' for officer safety reasons." Cain sat back up and Officer Garner asked for him for his identification.

Officer Garner asked dispatch to run a records check and learned that Cain had an active Fourth Amendment waiver. Officer Garner returned to the Camry and asked Cain to step out of the vehicle. At that point, he considered Cain detained. He searched Cain's person and then proceeded to search the vehicle based on the Fourth Amendment waiver. During the

3

search, Officer Garner discovered a bag on the floorboard where Cain had been reaching that contained multiple smaller baggies containing over 43 grams of methamphetamine and over 2 grams of heroin.

**B.      *The February 2, 2021 Encounter***

Approximately one week later, on February 2, the El Cajon Police Department received a call about a man walking through a parking lot, looking in car windows. The caller indicated the man was somehow associated with a red sedan. An officer arrived on the scene and located the red sedan. He found Cain and another individual in the vehicle. Cain had a plastic container in his pocket containing 1.42 grams of methamphetamine, a capsule containing 0.19 grams of heroin, and a bag that contained two glass pipes of a variety commonly used to smoke methamphetamine.

**C.      *The March 3, 2021 Encounter***

On the evening of March 3, 2021, El Cajon Police Officer Jeffrey Taylor was on patrol near Parkway Plaza shopping mall. The mall closed at 7:00 p.m. but Officer Taylor was aware that people would occasionally park in the parking structure after hours to conduct criminal activity so he decided to drive through the structure at approximately 9:15 p.m.

As he was driving through the parking structure, Officer Taylor saw a red Camry parked in the middle of the second floor with no other people or cars around. He pulled up towards the passenger side of the vehicle, about two car lengths away, so that the car could have easily backed up or driven forward to leave. He observed Cain passed out in the driver's seat with his head rolled back on the headrest and a passenger hunched over in the front seat.

Officer Taylor was concerned that the occupants of the vehicle had overdosed and wanted to make sure they "were not up to any criminal activity," so he exited his patrol vehicle and walked towards the Camry. As

4

he did so, the female passenger quickly reached toward the floor and opened her door. He told her to stay in the car and watched as she made several attempts to shake Cain awake. Cain woke up while Office Taylor and the passenger were talking and voluntarily provided his identification. Officer Taylor ran a record check and subsequently conducted a Fourth Amendment waiver search of the vehicle. The front door panel was loose and, once removed, revealed two cloth bags containing methamphetamine and other drug paraphernalia.

## D.    *The Motion to Suppress and Trial*

The People charged Cain with two counts of possession for sale of a controlled substance related to the January 27, 2021 encounter (counts 1 and 2); one count of possession for sale of a controlled substance related to the March 3, 2021 encounter (count 3); and two counts of possession of a controlled substance related to the February 2, 2021 encounter (counts 4 and 5). Cain moved to suppress all evidence obtained from the searches on January 27 and March 3, 2021, and asserted that the police officers in each instance acted without a warrant and without probable cause. After hearing testimony from the officers involved, and argument from the parties, the trial court denied the motion to suppress as to both searches and the case proceeded to trial.

At the conclusion of evidence, and just a few hours after the jury began deliberations, they sent a note to the court indicating they could not reach an agreement on two of the five counts. The trial court consulted with counsel and over defense counsel's objection, instructed the jury to continue deliberations. The jury reached a verdict the next morning, finding Cain guilty on counts 1, 2, 4, and 5, as charged, and guilty of a lesser included offense of possession of a controlled substance (not for sale) on count 3.

## III. DISCUSSION

### A. *The Trial Court Did Not Err in Denying Cain's Motion to Suppress*

Cain asserts that the trial court erred in denying his motion to suppress as to the January 27, 2021 encounter.[2]

### 1. Additional Factual Background

In their opposition to the motion, the People asserted that Officer Garner was acting in his capacity as a community caretaker when he responded to the call and checked on the welfare of the two unconscious individuals in the car. From there, the People asserted, the encounter proceeded as consensual. Cain was not detained when Officer Garner knocked on the window and began to speak with him. At the hearing on the suppression motion, the People maintained that the encounter was consensual up until the point that Officer Garner found out that Cain had a Fourth Amendment waiver and decided to conduct a search, but also asserted that Officer Garner had reasonable suspicion before then that Cain was under the influence of a controlled substance.

Addressing both the January 27 and March 3 encounters, the trial court found that "both officers were obligated, pursuant to the calls they received or at least in the first instance, were a community caretaking exception." In addition, the court found that "both instances were consensual encounters," and that "the circumstances were reasonable under the given situations." The court noted that in both instances, the officers referred to

---

[2] Cain did not move to suppress the evidence as to the February 2, 2021 encounter, and does not assert that the trial court erred by denying his motion to suppress as to the March 3, 2021 encounter, and we therefore do not consider the legality of those searches. We discuss Officer Taylor's testimony at the suppression hearing concerning the March 3 encounter only to the extent that it corroborates statements made by Officer Garner.

movements by Cain or the female that accompanied him.  Finally, the court found that the officers were entitled to ask for identification and "that there was no unduly show of authority" or "prolonged detention" in either case.

### 2. Relevant Legal Principles

The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures and is applicable to states by virtue of the due process clause of the Fourteenth Amendment. (U.S. Const., 4th & 14th Amends.; *People v. Camacho* (2000) 23 Cal.4th 824, 829.)  When presented with a motion to suppress based on an alleged violation of the Fourth Amendment, the trial court makes findings of fact regarding the circumstances surrounding the search and applies those findings to the law to determine whether the search was reasonable.  (*People v. Parson* (2008) 44 Cal.4th 332, 345.)  On appeal, we review the trial court's factual findings for substantial evidence and independently review whether the search was reasonable based on those facts.  (*Ibid.*; *People v. Oldham* (2000) 81 Cal.App.4th 1, 9.)

As relevant here, the California Supreme Court has recognized the following "three broad categories" of police encounters in the context of the Fourth Amendment "ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 (*Manuel G.*).)  "Consensual encounters do not trigger Fourth Amendment scrutiny." (*Ibid.*; see also *Florida v. Bostick* (1991) 501 U.S. 429, 434.)  "Unlike detentions, they require no articulable suspicion that the person has committed or is about to commit a crime." (*Manuel G., supra,* at p. 821; *People v. Rivera* (2007) 41 Cal.4th 304, 309 ["[i]t is well established that law

enforcement officers may approach someone on the street or in another public place and converse if the person is willing to do so"].)  A detention, on the other hand, while less intrusive than a formal arrest, does require some objective manifestation of reasonable suspicion.  (See *People v. Souza* (1994) 9 Cal.4th 224, 230 (*Souza*) (["the temporary detention of a person for the purpose of investigating possible criminal activity may, because it is less intrusive than an arrest, be based on 'some objective manifestation' that criminal activity is afoot and that the person to be stopped is engaged in that activity"].)

In addition, "the United States Supreme Court [has] recognized that a significant portion of police work is devoted to community caretaking functions, where no criminal misconduct is under investigation.  In the performance of such functions, evidence of a crime may be discovered and then challenged in court, requiring a determination of the applicability of the community caretaking exception to the warrant requirement." (*People v. Madrid* (2008) 168 Cal.App.4th 1050, 1052−1053 (*Madrid*), citing *Cady v. Dombrowski* (1973) 413 U.S. 433.)  California courts have since applied the community caretaking exception in the context of vehicle stops resulting in detentions.  (*Madrid, supra,* at p. 1053.)

"The appropriate standard under the community caretaking exception is one of reasonableness:  Given the known facts, would a prudent and reasonable officer have perceived a need to act in the proper discharge of his or her community caretaking functions?" (*People v. Ray* (1999) 21 Cal.4th 464, 476–477 (*Ray*).)  " '[I]n determining whether the officer acted reasonably, due weight must be given not to his [or her] unparticularized suspicions or "hunches," but to the reasonable inferences which he [or she] is entitled to draw from the facts in the light of his [or her] experience; in other words, he

8

[or she] must be able to point to specific and articulable facts from which he [or she] concluded that his action was necessary.' " (*Id*. at p. 477.)

### 3. Analysis

Cain implicitly concedes that Officer Garner was acting reasonably and in accordance with his community caretaking function when he first contacted Cain to ensure that he was not overdosing. He asserts, though, that Officer Garner should not have proceeded any further once he knocked on the window and Cain woke up, because, at that point, there was no indication that Cain was overdosing or in medical distress. He argues further that Officer Garner conducted the records check and resulting search entirely for law enforcement purposes, and not in his capacity as a community caretaker.

As is frequently the case in such encounters, the nature of Officer Garner's interactions with Cain evolved and shifted over the course of the encounter. Officer Garner initially approached the Camry based on the call to dispatch reporting two individuals passed out in the backseat. At that point, Officer Garner's primary concern was the wellbeing of the occupants. Cain does not dispute the reasonableness of Officer Garner's actions in walking up to the car and knocking on the window or that those actions were justified under the community caretaking function. (See *Ray, supra,* 21 Cal.4th at pp. 476−477.)

At the same time, though, Officer Garner was also aware that the vehicle was parked near a house known for drug activity and the condition of the two occupants raised suspicions that they were under the influence of a controlled substance. At the hearing on Cain's motion to suppress, Officer Garner testified, "when I see people passed out in their car in the manner that they were, [it is] usually indicative of someone who is possibly under the influence of a controlled substance and either [overdosed] or used it to —

9

where they generally pass out. . . . So my first belief was that these people were possibly under the influence and possibly had [overdosed]." He also agreed with the prosecutor that it is a crime to be under the influence of a controlled substance in a public place. Although Officer Garner was acting primarily in his community caretaking capacity when he approached the vehicle, that fact did not require him to ignore readily apparent evidence of criminal activity. (See *Madrid, supra,* 168 Cal.App.4th at p. 1053; *Ray, supra,* at 21 Cal.4th at p. 474 [" 'in the course of conducting a reasonable search the [officers] did not have to blind themselves to what was in plain sight simply because it was disconnected with the purpose for which they entered' "].)

Cain asserts that Officer Garner should not have proceeded any further once he woke up, signaling that he was not in fact overdosing. However, Officer Garner testified that Cain was "sluggish" and "slow in his movements," which caused Officer Garner to continue to believe that Cain was possibly under the influence of a controlled substance. In addition, and although related to a separate encounter, Officer Taylor explained that just because someone wakes up does not mean that all danger has passed and, in his experience, it is "not uncommon for people who have been under the influence or a overdoes to either wake up on their own or by Narcan and then go back into an overdose state." Thus, it was reasonable for Officer Garner to continue to observe Cain at least for a short period of time.

While he was doing so, Cain voluntarily opened the door to the Camry. At this point, there is no indication that Officer Garner had made any significant show of authority or otherwise indicated that Cain was not free to leave. To the contrary, he testified that he had parked approximately 20 feet away from the Camry, in a manner that did not block the Camry from

10

leaving and there was no evidence that he said anything to Cain indicating that the conversation was anything but consensual. (See, e.g., *Manuel G., supra,* 16 Cal.4th at p. 821 ["Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled."].)

Within moments of voluntarily opening the door and *before* Officer Garner asked Cain for his identification, Cain put his hands between his legs and reached towards the floor. Officer Garner noticed "a little bag" on the floor that Cain may have been reaching for, and said, " 'Let's keep your hands in sight,' for officer safety reasons." At that point, Cain was no longer free to leave and the encounter transitioned from a consensual encounter to a detention. (See *Manuel G., supra,* 16 Cal.4th at p. 823 [encounter remained consensual until defendant threatened officer]; *People v. Castaneda* (1995) 35 Cal.App.4th 1222, 1227 ["once [the defendant] complied with [the] request and submitted his identification card to the officers, a reasonable person would not have felt free to leave"].)

However, by then, Officer Garner had both reasonable suspicion that criminal activity was afoot and a valid concern for his own safety. (See *Souza, supra,* 9 Cal.4th at p. 240 ([individual in a vehicle reaching toward the floorboard, along with other circumstances, justified temporary detention]; *Terry v. Ohio* (1968) 392 U.S. 1, 27 ["the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger"]).) Considering the totality of circumstances, it was reasonable for Officer Garner to ask Cain to keep his hands in sight and to ask for identification. (See *Souza, supra*, at p. 231 [a

11

detention is reasonable "when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity"].)

Finally, after detaining Cain for a relatively short period of time to run a records check, Officer Garner discovered that Cain had a valid Fourth Amendment waiver and therefore decided to search the vehicle. Cain does not dispute that he was subject to a Fourth Amendment waiver at the time of the search, or that Office Garner ultimately conducted the search pursuant to that waiver. (See *People v. Bravo* (1987) 43 Cal.3d 600, 611 ["a search condition of probation that permits a search without a warrant also permits a search without 'reasonable cause' "].)

Cain argues that the facts here are akin to *Madrid*, in which the appellate court recognized the community caretaking exception but ultimately found that the information available to the officer was insufficient to justify a vehicle stop and detention. (*Madrid, supra,* 168 Cal.App.4th at p. 1053.) In *Madrid*, the officer blocked a vehicle from leaving a parking lot after observing that a *passenger* in the vehicle was sweaty and had an unsteady gait when walking to the car. (*Ibid*.) The court found that the circumstances did not justify the stop, primarily because the alleged inference that the passenger was suffering from an overdose was unreasonably speculative and there was no reason for the officer to believe that the driver could not provide any care or assistance that the passenger needed. (*Id*. at pp. 1059–1060.)

By contrast, here, Officer Garner was responding to a call from a concerned citizen noting that *both* individuals in the car were passed out. Thus, the other individual in the car was unable to assist Cain and Officer

Garner's initial check on their wellbeing was both reasonable and justified. Officer Garner did not block the car from leaving or turn on his lights, and the encounter proceeded at first as consensual. It became a relatively brief detention leading to a search of the vehicle under a valid Fourth Amendment waiver only after Officer Garner observed Cain reaching for the bag on the floor. Considering the totality of circumstances, we conclude that Officer Garner acted reasonably at each step and at no time violated Cain's Fourth Amendment rights.

**B.** ***The Trial Court Did Not Err by Instructing the Jury to Continue Deliberations***

Cain next contends that the trial court erred by instructing the jury to continue deliberating after they claimed to be at an impasse.

After deliberating for approximately three and one-half hours, the jury sent a note to the court stating, "We have agreed on a verdict on Counts 1, 4 and 5. For Counts 2 and 3 we have not reached agreement on a verdict. Do we continue to deliberate given up to four/five jury members have stated they will not change their minds?" The trial court discussed the note with counsel and, over defense counsel's objection responded to the jury as follows:

> "I just want to remind everyone, the jury instructions, that every juror is expected to deliberate, which means to be willing to discuss with all of their fellow jurors the evidence that was presented. And that certainly this Court can't ensure that a verdict is reached, but you understand, I'm sure, that the goal is that the jury should try to reach a verdict. And I do think that I'm – that given the short time that you have deliberated, that I would hope that some additional discussions could be helpful, especially since it says four to five jury members. So I think there may be some room for discussion."

The court then released the jury for the evening. The next day, after approximately two more hours of deliberations, the jury reached a verdict on all five counts.

Penal Code section 1140 provides: "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." " 'The decision whether to declare a hung jury or to order further deliberations rests in the trial court's sound discretion.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 88.) "However, a court must exercise its power under [Penal Code] section 1140 without coercing the jury, and 'avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." ' " (*Brooks, supra,* at p. 88.)

In *People v. Gainer* (1977) 19 Cal.3d 835 (*Gainer*), our high court concluded that the trial court erred by essentially instructing a holdout juror to consider their status as a dissenter. (*Id.* at p. 848.) There, the jury reported difficulty in reaching a verdict and the trial court asked the foreman what the count was. The foreman informed the trial court that the count was eleven to one, and the court instructed the jurors, in relevant part, as follows: " 'if much the larger of your panel are for a conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression upon the minds of so many men or women equally honest, equally intelligent with himself or herself, and [who] have heard the same evidence with the same attention and with an equal desire to arrive at the truth and under the sanction of the same oath." (*Id.* at p. 841.)

14

The California Supreme Court reversed and held that the foregoing instruction "deflected [the jurors] from their proper role as triers of fact, as effectively as if they had been instructed to consider their doubts as to guilt in light of their own prejudices or desire to go home," and interfered with the defendant's right to have his guilt determined by the unanimous verdict of 12 jurors. (*Gainer, supra,* 19 Cal.3d at pp. 848–849; see also *People v. Hinton* (2004) 121 Cal.App.4th 655, 659–660 [trial court erred by instructing "jurors holding a minority position to question that position in light of the majority's view"].)

More recently, in *People v. Valdez* (2012) 55 Cal.4th 82 (*Valdez*), the California Supreme Court clarified that a mere reference to the numerical division of the jury is not, on its own, sufficient to render an instruction improper. (*Id.* at pp. 160–164.) There, the trial court stated that it assumed the jury was not evenly split and asked both those in the minority and the majority to "continue to argue the positions that you believe" and to "reweigh your positions in the light of all the arguments." (*Id.* at p. 160.) The Court held that reversal was not necessary in that case because "the instructions here did not exert pressure on or in any way encourage jurors in the minority to abandon their independent judgment and acquiesce in a verdict simply because the majority had reached a verdict." (*Id.* at p. 164.)

Likewise, here, the trial court did not encourage the jurors to abandon their own views or simply follow the majority. Rather, the court admonished *all* of the jurors to "discuss with all of their fellow jurors the evidence that was presented." After doing so, the court stated, "I would hope that some additional discussions could be helpful, especially since it says four to five jury members." When viewed in the context of the instruction as a whole, it is evident that the trial court was referencing the "four to five" only to

15

suggest that further discussion among the entire group may be helpful. The court did not discuss the minority or majority view, nor did it suggest in any way that the jurors on one side should consider the fact that they were in the minority as a factor in reaching their verdict.

Thus, we conclude that the instruction here does not raise the same concerns as in *Gainer*. (See *Gainer, supra,* 19 Cal.3d at pp. 848−849.) Following the Court's analysis in *Valdez*, we conclude that the instruction was not erroneous and does not compel reversal. (See *Valdez, supra,* 55 Cal.4th at pp. 160−164.)

## IV. DISPOSITION

The judgment is affirmed.

KELETY, J.

WE CONCUR:


DATO, Acting P. J.


CASTILLO, J.

16