Filed 4/3/14  P. v. Armendariz CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056671 |
| v. | (Super.Ct.No. BAF1100166) |
| BENJAMIN LOUIE ARMENDARIZ, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Bernard Schwartz, Judge. Affirmed.

Cindy Brines, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and A. Natasha Cortina and Sean M. Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

1

I. INTRODUCTION

Defendant and appellant Benjamin Louie Armendariz was charged with one count of unlawful possession of ammunition. (Pen. Code, former § 12316, subd. (b)(1).)[1] A strike prior was also alleged. (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1).) A jury convicted him of the substantive charge and defendant admitted the strike prior. He was sentenced to four years in prison. The court ordered defendant to pay restitution in the amount of $240 and imposed and stayed a $240 parole revocation fine. (§§ 1202.4, subd. (b), 1202.45.) He was credited with 107 days of actual, presentence confinement, plus 52 days of conduct credits.

On appeal, defendant makes the following contentions: (1) the court erred in denying his motion to suppress evidence allegedly obtained in violation of the Fourth Amendment's guarantee against unreasonable searches and seizures; (2) his conduct credits should have been, but were not, calculated based upon an October 1, 2011, amendment to section 4019; and (3) the amount of his restitution and parole revocation fines should each be reduced to $200. We reject these arguments and affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## II. FACTUAL SUMMARY

A. *Motion to Suppress*

### 1. Evidence Regarding Motion to Suppress

Prior to trial, defendant moved to suppress evidence obtained as a result of the warrantless search of his person and the vehicle in which he had been a passenger. The following summarizes the evidence produced at the hearing through the testimony of Riverside County Sheriff's Deputy Don Atkinson and Sergeant James Burton.

At around 10:30 p.m. on a date in January 2011, Deputy Atkinson was in uniform, driving a marked police car, and on patrol in the Cabazon area of Riverside County.[2] According to Deputy Atkinson, the area was "kind of a secluded area a couple miles off the freeway," "deserty," and a "lower-income" residential area. The lighting was "[v]ery poor." When asked if the area was a "good part" or "[b]ad part" of town, Deputy Atkinson said he had made "numerous arrests in that area" for crimes such as "drugs, warrants, [and] assault with deadly weapons."

Deputy Atkinson saw a blue Saturn parked in front of a house on Maxine Street. The car's running lights, or parking lights, were on. He pulled in behind the car. The police car's headlights illuminated two people inside the Saturn. Although Deputy Atkinson did not hear anything, such as screaming, he decided "to check on their

---

[2] At the hearing on the motion to suppress, Deputy Atkinson testified that the incident took place on January 2, 2011, and Sergeant Burton testified it occurred on January 22, 2011. According to the information, the crime occurred on January 21, 2011. At trial, the two officers and a third witness testified the incident took place on January 21, 2011.

welfare." After turning on his spotlight and an "overhead takedown light," he got out of the patrol car. Defendant got out of the Saturn on the passenger side and began to walk away at a "casual" pace. At this point, Deputy Atkinson had no idea as to the welfare of the other occupant.

Deputy Atkinson's attention was now divided between the defendant walking away from the car and the welfare of the person remaining in the Saturn. He testified that he wanted defendant to get back in the car because "it's safer for him to be in there. If he's walking away, I'm—that's raising my suspicion." When asked if defendant had done anything to put the officer's personal safety at issue, Deputy Atkinson said that "most normal people don't walk away when the police pull in behind him." When asked again, Deputy Atkinson responded, "No."

As the defendant was walking away, Deputy Atkinson could not see the defendant's hands. The deputy stood behind his car "for cover." He asked defendant three times to get back into the car. The first time, defendant was about 15 to 20 feet away. When asked about the tone of his voice, Deputy Atkinson said: "I didn't yell at him, I said, 'Hey, man. Can you get back in the car?'" Defendant did not indicate that he heard the officer, and continued to walk away.

On cross-examination, Deputy Atkinson was questioned about his first request to the defendant as follows:

"Q. . . . And the first time you said, get back in the car, and he continued to walk away; is that correct?

4

"A. I didn't tell him to get back in the car, I asked him to get back in the car, and he continued to walk away.

"Q. Do you remember, perhaps, specifically how you asked him to get back in the car?

"A. I don't remember specifically. I know I didn't order him to get back in the car because I knew all I had at this point was a consensual encounter vehicle check."

When Deputy Atkinson asked defendant a second time "if he would get in the car," defendant "just kept walking."

When Deputy Atkinson asked the third time, defendant was "a good 20, 30 feet" away. That time, defendant stopped, turned around, and, without saying anything, got back into the front seat of the Saturn.

After defendant got inside the car, Deputy Atkinson approached the Saturn on the driver's side. He could see "a black, long gun, soft case" through the rear side window. Based on this observation, Deputy Atkinson believed there might be a gun in the vehicle. A woman (later identified as Jeania Garcia) was in the driver's seat. Deputy Atkinson removed his service weapon and asked the occupants to keep their hands up. They complied. Deputy Atkinson then called for backup.

Sergeant Burton arrived about six minutes later. After the officers conferred, Deputy Atkinson asked defendant to get out of the car. Sergeant Burton had defendant walk to the rear of the Saturn. He asked defendant if he could search his person, and defendant consented. Sergeant Burton found "an unloaded 30-06 magazine" in

5

defendant's back pocket. Deputy Atkinson found five .22-caliber bullets in a pocket of the gun case.

After defendant was removed from the car, Deputy Atkinson recognized him from "the warrant board" and told Sergeant Burton there was a warrant out for defendant's arrest. Sergeant Burton asked defendant if he was on probation or parole, and defendant said he thought he was on probation.

2. Trial Court's Findings and Ruling

After argument by counsel, the court first addressed the question of when defendant was detained for purposes of the Fourth Amendment. The court summarized the facts as follows: "Officer Atkinson sees a vehicle on the side of the road. It does not appear to be incapacitated, it is running, and there are occupants in the vehicle. . . . [¶] . . . [Deputy Atkinson] illuminates the vehicle—certainly gives notice to the occupants that he's there. And upon doing that, [defendant] leaves the vehicle and starts to walk away. . . . [Deputy Atkinson made a request,] not an order, but a request . . . to come back, or return to the vehicle[.] [T]here is still another individual in the car that Deputy Atkinson has not had an opportunity to contact, does not know if that person is in some distress . . . ." The court noted that Deputy Atkinson made three requests of defendant to return to the car, and added: "But they were not orders, they were not done in a tone that would suggest an order to the individual, but rather merely a request."

The court further found that, prior to defendant's return to the car, there were no other peace officers present, Deputy Atkinson had not displayed a weapon, Deputy

6

Atkinson was not physically close to and did not touch defendant, and the requests to return to the car were made "in a tone of voice sufficient to allow individuals a distance away to hear him, but not in an orderly fashion."[3]

Based on these findings, the court concluded that a detention had not occurred up to this point, "but rather merely an investigative act on the part of the peace officer, and . . . an attempt to get a consensual contact by [defendant] and the occupant."

The court found that a detention did occur when Deputy Atkinson pulled out his gun after seeing the gun case in the backseat of the car. This detention, the court concluded, was "lawful because it was based upon [Deputy Atkinson's] view inside the car, and the belief that there may now be a criminal act occurring, danger to him in the sense that one of those occupants might have access to a firearm." The same facts provided the officers with probable cause to search the vehicle and the gun case. Finally, defendant's consent to be searched made the search of his person lawful.

B. *Summary of Evidence Presented at Trial*

At trial, the prosecution offered the testimony of Deputy Atkinson and Sergeant Burton, both of whom testified to substantially the same facts adduced at the hearing on the motion to suppress, which are described above.

---

[3] Although "orderly" usually denotes something that is "arranged, disposed, or organized in some order, pattern, or sequence" (Webster's 3d New Internat. Dict. (1993) p. 1588), in the context it is used here, it is clear that "not in an orderly fashion" means not in a manner suggesting an order.

The defense presented testimony by Garcia, the woman who was in the car with defendant. She testified as follows. Defendant was her boyfriend. On the night of the incident, defendant had gone to his cousin's (Ethan's) house on Maxine Street. Garcia drove to Ethan's house to pick up defendant. Along the way, she saw a black rifle bag in a field, picked it up, and put it on the backseat of her car. When she arrived at Ethan's house, defendant came outside to her car, opened the front passenger door, and knelt down to talk to her. Defendant asked her if she wanted to go home or to Ethan's house. She said she wanted to go home. She did not mention the rifle bag to defendant. Defendant began to walk back to Ethan's house to tell Ethan that he and Garcia were going home. At that point, a sheriff's car pulled up, shined a spotlight on them, and ordered defendant to stop. The officer told defendant to stop a second time.

According to Garcia, defendant "wasn't doing anything wrong, he was walking to the house—and the cop told him to go back to the vehicle, and ordered him to get inside the vehicle." The officer then walked up to her window, saw the rifle bag in the backseat, "held [them] at gunpoint," and waited for backup to arrive.

In the prosecution's rebuttal case, Deputy Atkinson testified that on the night of the incident Garcia told him the following: Defendant was carrying the black bag with him when he walked to Garcia's car; defendant got into the passenger seat and put the bag on the backseat; and defendant told Garcia that he found the bag in a field. Deputy Atkinson further testified that Garcia did not tell him that the bag was hers.

8

III.  DISCUSSION

A.  *Defendant's Motion to Suppress Was Properly Denied*

"'Our review of issues related to the suppression of evidence seized by the police is governed by federal constitutional standards.'  [Citations.]  'In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence.  [Citation.]  We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment.'  [Citation.]"  (*Robey v. Superior Court* (2013) 56 Cal.4th 1218, 1223.)

The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . . ."  (See *Mapp v. Ohio* (1961) 367 U.S. 643, 643-660.)  Evidence seized in violation of this right may be subject to exclusion at trial.  (*People v. Williams* (1999) 20 Cal.4th 119, 125.)

"'[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 790, quoting *United States v. Mendenhall* (1980) 446 U.S. 544, 554.)

Defendant contends he was illegally detained from the point of initial contact with Deputy Atkinson—when the officer activated the spotlight and takedown light to illuminate the car.  Defendant further explains that, "[a]lthough [Deputy] Atkinson

'asked' [him] to get back in the car, this was not a general question, this was an order which prevented [him] from leaving the area. This display of authority created a situation where [defendant] was not free to simply disregard [Deputy] Atkinson's order(s) and walk away." This detention, he argues, was unlawful because Deputy Atkinson did not have articulable facts to support a reasonable suspicion that defendant was involved in criminal activity. We reject defendant's argument.

When police engage an individual in a consensual encounter, there has been no "seizure" and the Fourth Amendment is not implicated. (See *Florida v. Royer* (1983) 460 U.S. 491, 497 (*Royer*).) As the Supreme Court explained in *Royer*, police "officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. [Citations.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. [Citation.] The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. [Citations.] He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. [Citation.] If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed." (*Id.* at pp. 497-498; accord, *People v.*

10

*Hughes* (2002) 27 Cal.4th 287, 328.) "'A police officer may stop and question persons on public streets, *including those in vehicles*, when the circumstances indicate to a reasonable man in a like position that such a course of action is called for in the proper discharge of the officer's duties.' [Citation.]" (*People v. Gonzales* (1985) 164 Cal.App.3d 1194, 1197.) [4]

Here, the car in which defendant was a passenger was parked on a public roadway at 10:30 p.m. in a poorly lit secluded residential area. Numerous crimes, such as assaults with deadly weapons, had occurred in the vicinity. Deputy Atkinson's intent in pulling up behind the car was to check on the well-being of the occupants.

Because Garcia's car was in a public place and not moving, there was no "traffic stop" that would implicate the Fourth Amendment and, therefore, the requirement of a reasonable suspicion of criminal activity. (See, e.g., *Delaware v. Prouse* (1979) 440 U.S. 648, 653 ["stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of" the Fourth Amendment].) Deputy Atkinson used a white spotlight to illuminate the car and its occupants; he did not use a flashing red light that would indicate an obligation to "stop and remain stopped." (See Veh. Code, § 21806; see also *People v. Rico* (1979) 97 Cal.App.3d 124, 128-130 [no detention when police officer

_____

[4] "'The policeman . . . has "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses"; by default or design he is also expected to "aid individuals who are in danger of physical harm," "assist those who cannot care for themselves," and "provide other services on an emergency basis."' [Citations.]" (*People v. Madrid* (2008) 168 Cal.App.4th 1050, 1056, fn. 3.)

used spotlight to observe occupants inside moving car, and did not use flashing lights or siren]; *People v. Franklin* (1987) 192 Cal.App.3d 935, 940 [pulling up in patrol car behind defendant and shining spotlight on defendant was not "sufficient to convince a reasonable man he was not free to leave."].) Although defendant "rightly might feel himself the object of official scrutiny[,] . . . such directed scrutiny does not amount to a detention." (*People v. Franklin, supra,* at p. 940.) As such, Deputy Atkinson, in pulling up behind the vehicle in which defendant was a passenger, was doing nothing more than attempting to engage the occupants in a consensual encounter for purposes of checking on the well-being of the occupants.[5]

A consensual encounter may ripen into a detention implicating the Fourth Amendment when an officer restrains a person's liberty by force or show of authority. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1081; *Terry v. Ohio* (1968) 392 U.S. 1, 20, fn. 16.) Facts that might indicate a detention are "the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might

---

[5] Under the concept of "community caretaking functions," police officers are expected to aid individuals who are in danger of harm. Performing such functions does not implicate the Fourth Amendment when there are articulable facts justifying the officer's actions. In *People v. Ray* (1999) 21 Cal.4th 464, 472-473, 478, a warrantless search of a home was justified by the possibility of a burglary in progress and the officers' concern for welfare of persons inside. In *People v. Madrid, supra,* 168 Cal.App.4th at page 1058, the court indicated that a vehicle stop could be based "on the officer's perception that an occupant's welfare requires this action." When, as here, a police officer approaches a vehicle parked on the public roadway, the factual showing necessary to invoke the community caretaking functions exception is less than the showing necessary to enter one's home or stop a moving car.

be compelled." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.) A detention may be "reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231.)

Here, the record supports a conclusion that defendant was not detained when Deputy Atkinson asked defendant to return to Garcia's car—that is, a reasonable person in defendant's shoes would feel that he was free to leave in spite of being asked to return to the car. When defendant got out of Garcia's car and began to walk away, Deputy Atkinson stayed behind his patrol vehicle. Deputy Atkinson did not touch, follow, or chase defendant. The deputy was by himself and did not display a weapon. There is no evidence that defendant's path away from the scene was physically obstructed in any way. Significantly, the court found that Deputy Atkinson's three requests that defendant return to the car "were not orders, they were not done in a tone that would suggest an order to the individual, but rather merely a request." This finding is supported by Deputy Atkinson's uncontradicted testimony about his statements to defendant. He described each as a request, not an order: he "asked [defendant] to get back in the car"; and "I had to ask him two more times . . . ." Regarding his first request to defendant, Deputy Atkinson was asked to describe his tone of voice. The officer answered: "Well, he was a good 15, 20 feet, so I—I didn't yell at him, I said, 'Hey, man. Can you get back in the car?'" This question and answer suggests that Deputy Atkinson testified with the same

13

tone of voice he used when he spoke to defendant on the night of the incident.[6]  In that defendant had been politely asked to return to the car three times without being ordered, a reasonable person in defendant's shoes could believe that the deputy was not going to order defendant back to the car, and he was therefore free to leave.

Based on all the circumstances surrounding this incident, we can conclude that until the time Deputy Atkinson saw the rifle bag and drew his gun, he was attempting to engage defendant in a consensual encounter and that a reasonable person in defendant's position would have believed that he could decline the deputy's request and "go on his way."  (See *Royer, supra,* 460 U.S. at p. 498.)  The deputy's efforts did not, therefore, implicate the Fourth Amendment.[7]

Defendant relies heavily on *People v. Spicer* (1984) 157 Cal.App.3d 213 (*Spicer*). In that case, the defendant was a passenger in a car driven by Thomas Brotwell.  (*Id.* at p. 216.)  Police officers saw Brotwell's car weaving between lanes and noticed the rear license plate was obstructed and the license plate light was not working.  The officers

---

[6]  Because we have only our cold, transcribed record, we have no basis for rejecting the trial court's conclusion regarding Deputy Atkinson's tone of voice.  We therefore reject defendant's characterization of Deputy Atkinson's statements as an "order" or "command."

[7]  The Attorney General makes numerous arguments that might be relevant if Deputy Atkinson detained defendant prior to seeing the rifle bag.  These include arguments that the detention was supported by the officer's reasonable suspicion, the subsequent search was independently authorized by defendant's outstanding warrant and probation status, and the magazine found in defendant's pocket was admissible under the inevitable discovery doctrine.  Because we conclude that defendant was not detained until Deputy Atkinson found the rifle bag and drew his weapon, we do not reach these additional arguments.

14

pulled Brotwell over. Brotwell got out of the car and walked unsteadily and had a strong odor of alcohol about him. While one officer administered a field sobriety test to Brotwell, another officer walked to the passenger side of the car and asked the defendant to produce a driver's license. As the defendant looked through her purse for her license, the officer illuminated the purse with a flashlight and saw what appeared to be the butt of a handgun. The officer told the defendant to stay out of the purse and get out of the car. (*Ibid*.) The officer testified that the reason he asked the defendant for identification "was, 'In the event that we released the vehicle to her, I wanted to make sure she had a valid California driver's license. I also wanted to see if she had been drinking . . . .'" (*Id.* at pp. 216-217.) The trial court granted the defendant's motion to suppress. (*Id.* at p. 216.)

The *Spicer* court gave the following reasons for affirming the trial court's order. First, the defendant "was contacted as she sat in the passenger seat of an automobile in a residential neighborhood at 1:30 in the morning. Her freedom of movement was practically nil." (*Spicer, supra,* 157 Cal.App.3d at p. 218.) Second, the defendant "was confronted by a uniformed officer almost immediately after the car in which she was riding was stopped. Without any explanation or prefatory remarks, the officer requested her driver's license." (*Id.* at p. 219.) Third, the defendant testified credibly that she was going to comply with the officer's requests because she has "'read too many people getting shot these days by policemen . . . .'" (*Ibid*.) The court appeared to consider this testimony as evidence that the officer's request for the driver's license was a "'"courteous expression of a demand backed by force of law."'" [Citation.]" (*Ibid*.) Fourth, the officer

15

did not tell the defendant his reasons for requesting her driver's license. (*Ibid*.) The *Spicer* court concluded: "[U]nder the totality of the circumstances of the present case the failure to offer [the defendant] a choice whether or not to produce her driver's license, together with the other factors discussed above, resulted in a seizure for Fourth Amendment purposes. Nor are we holding that every time a police officer converses with an automobile passenger in a situation like this it inevitably constitutes a detention. What was involved here was not casual banter but a direct request the defendant search for and produce a document. In circumstances pregnant with coercion that amounts to an unlawful seizure." (*Id.* at p. 220, fn. omitted.)

Here, the totality of the circumstances is not so coercive. In contrast to the situation in *Spicer*, defendant's freedom of movement was not constrained by his environment; he was walking away from the officer, not sitting in the car's passenger seat. Significantly, there was no evidence comparable to the defendant's testimony in *Spicer* about the fear of being shot if she did not comply; indeed, there is nothing to contradict the court's finding that Deputy Atkinson's statements to defendant "were not orders, they were not done in a tone that would suggest an order to the individual, but rather merely a request." Therefore, while we do not disagree with *Spicer*, it is not controlling here.

If defendant was detained when asked to return to the car, the record also supports the conclusion that the detention was lawful, even if there was no basis for the deputy to suspect that criminal activity was afoot.

16

When Deputy Atkinson initially pulled up behind the car he was attempting to check on the well-being of its occupants. When defendant started walking away from the car, the deputy thought that to be unusual. The deputy's attention was now divided between defendant, who was walking away, and the remaining occupant, whose welfare the deputy wished to check. It was nighttime and, as the deputy stood next to his patrol car "for cover," defendant's hands were not observable. Under these circumstances, and for the officer's safety, the deputy could lawfully order defendant to return to the car. (See *People v. Vibanco* (2007) 151 Cal.App.4th 1 (*Vibanco*).)

In *Vibanco*, two officers in an unmarked car initiated a traffic stop of a vehicle with a cracked windshield and no front license plate. (*Vibanco, supra,* 151 Cal.App.4th at p. 4.) There were four occupants in the vehicle. As the officers approached, the defendant opened the right rear passenger door and began to exit the vehicle. At this time, one of the officers saw a woman seated in the backseat behind the driver "'[reach] . . . underneath her shirt into her waistband . . . .'" (*Id.* at p. 5.) The officer felt she could "'be arming herself or destroying evidence.'" (*Ibid.*) The officer ordered her to show her hands, which she did. At that point, one of the officers directed all of the occupants to exit the car and sit on the curb "'[i]n order to stabilize the situation' because there were 'too many things going on at one time' and he was afraid the officers 'were starting to lose control of the car stop.'" (*Id.* at p. 6.) As one officer was dealing with the driver, the other officer asked the defendant for identification. After determining that the identification was false, the officer began to handcuff the defendant; the defendant fled.

Upon being apprehended, the officers found an American Express card, with the name scratched off, in the pants pocket of the defendant. (*Ibid.*)

"At the conclusion of the testimony at the suppression hearing, the prosecutor argued to the court that, when officers stop a vehicle for an infraction, the officers have the power to detain all occupants of the car if there is a reason for the officers to suspect that the occupants may be a threat to the officers. . . . [¶] Defendant argued that passengers cannot be detained without reasonable and articulable facts that would lead officers to believe that the passengers have committed a crime. Defendant argued that he did nothing other than exit the [vehicle] before he was ordered back, and therefore his detention was unlawful." (*Vibanco, supra,* 151 Cal.App.4th at p. 7.) The trial court, in granting the motion stated: "'There's no probable cause to stop the defendant from exiting the car and continuing on his journey.'" (*Ibid.*)

The appellate court disagreed. It first found that the officers were justified in stopping the vehicle to investigate the Vehicle Code violations. (*Vibanco, supra,* 151 Cal.App.4th at p. 8.) Accepting the Attorney General's concession that the passengers were seized when they were first ordered to remain in the car and then ordered to exit the car and sit on the curb, the court went on to address whether the seizure was lawful in the absence of any reasonable suspicion that the passengers were engaged in criminal activity.

In finding the detention of the passengers lawful, the court stated: "[T]he officers were justified in ordering defendant to stay in the car, and then to get out of the car with

the other occupants. The two officers in this case were dealing not only with the driver of the stopped car, but with three passengers. One of the passengers was making furtive movements in the backseat at the same time as defendant, the other passenger in the backseat, was attempting to leave the car. The third passenger in the front seat chose to remain in the car. Thus, if the officers allowed defendant to walk away, the possibility of a violent encounter could arise from two locations: one from inside the car and the other from defendant's location outside the car. The officers' attention could be distracted by the different movements of the various occupants of the car. The officers, therefore, could reasonably require defendant to stay with the other occupants of the car, either inside or outside the car, pending completion of the car stop." (*Vibanco, supra,* 151 Cal.App.4th at p. 11.)

Relying on *Maryland v. Wilson* (1997) 519 U.S. 408 and *United States v. Williams* (9th Cir. 2005) 419 F.3d 1029, the *Vibanco* court concluded by stating: "'Giving officers the authority to control all movement in a traffic encounter is sensibly consistent with the public interest in protecting their safety. [Citations.] Allowing a passenger, or passengers, to wander freely about while a lone officer conducts a traffic stop presents a dangerous situation by splitting the officer's attention between two or more individuals, and enabling the driver and/or the passenger(s) to take advantage of a distracted officer.' [Citation.] 'In the final calculus, we think it best left to the discretion of the officers in the field who confront myriad circumstances we can only begin to imagine from the relative safety of our chambers. . . . [U]nder the Fourth Amendment it is reasonable for an

19

officer to order a passenger back into an automobile that he voluntarily exited because the concerns for officer safety . . . , and specifically the need for officers to exercise control over individuals encountered during a traffic stop, outweigh the marginal intrusion on the passenger's liberty interest.' [Citation.]" (*Vibanco, supra,* 151 Cal.App.4th at p. 12.)

In our case, not unlike *Vibanco,* the officer was lawfully performing his duties in pulling up behind the parked vehicle for purposes of checking on the welfare of the car's occupants. As the deputy got out of his car in an attempt to check on the occupants, defendant voluntarily exited the vehicle and began to walk away from the officer. The officer could not see his hands. It was nighttime and the lighting was very poor; the area was secluded and "deserty" in nature. There had been a number of arrests for drugs and assaults with deadly weapons in the area. The deputy was clearly concerned for his safety in that as he was asking defendant to return to the vehicle as he was using his car for cover. Given these circumstances, the detention of defendant by Deputy Atkinson, for purposes of checking on the welfare of the driver, was both reasonable and lawful.

Defendant's further arguments that the subsequent searches of defendant were unlawful are based upon the success of his argument that he was unlawfully detained before Deputy Atkinson saw the rifle bag. That is, his subsequent consent to be searched was tainted by the initial, illegal detention. Because we reject defendant's unlawful detention premise, there is no merit to his "taint" argument.

B.  *Calculation of Conduct Credits*

Defendant committed his crime in January 2011.  At that time, section 4019 provided for an award of conduct credits such that if all possible days were earned, an inmate would be credited with six days of confinement for every four days of actual confinement.[8]  (Former § 4019, subd. (f), amended by Stats. 2010, ch. 426, § 2, p. 2088; see *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1549 (*Ellis*).)  This ratio of conduct credits to actual time has been described as "one-for-two."  (See *Rajanayagam, supra,* 211 Cal.App.4th at p. 48.)

In 2011, the Legislature amended section 4019.  (Stats. 2011, ch. 15, § 482, pp. 497-498; see *Ellis, supra,* 207 Cal.App.4th at p. 1549.)  As a result of the amendment, section 4019 now provides that, if all possible days are earned, an inmate will be deemed to serve four days for every two days of actual confinement.  (§ 4019, subd. (f); *Ellis, supra,* at p. 1549.)  This is a "one-for-one" or "two-for-two" ratio.  (See *People v. Kennedy* (2012) 209 Cal.App.4th 385, 395 (*Kennedy*); *People v. McPheeters* (2013) 218 Cal.App.4th 124, 127.)  The 2011 amendments to section 4019 took effect on October 1, 2011.  (Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 12, § 35, pp. 5976-5977.)

The 2011 amendment also added subdivision (h) to section 4019.  This subdivision provides:  "The changes to this section enacted by the act that added this

---

[8]  The term "conduct credits" refers to credit against the prisoner's sentence for performing assigned labor and complying with applicable rules and regulations.  (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42 (*Rajanayagam*), citing § 4019, subds. (b), (c).)

21

subdivision shall apply prospectively and shall apply to prisoners who are confined to a county jail, city jail, industrial farm, or road camp for a crime committed on or after October 1, 2011.  Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law."  (Fn. omitted.)

Defendant's confinement began in March 2012.  He then spent 107 days in custody before being sentenced in June 2012.  In addition to the 107 actual days, the trial court awarded him 52 conduct credits.  The number of conduct credits is consistent with the version of section 4019 in effect at the time he committed his crime.

Defendant contends the court should have applied conduct credits on a one-for-one basis under the 2011 amendment for two reasons.  First, he argues that section 4019, subdivision (h), which expressly provides for *prospective* application of the one-for-one ratio to confinement for crimes committed on or after October 1, 2011, should be construed to apply to all prisoners *in custody* after October 1, 2011.  Second, if we disagree with his construction of section 4019, subdivision (h), the statute violates his right to equal protection.  We reject both contentions.

The first sentence of section 4019, subdivision (h) (quoted above) is unambiguous and makes clear that the 2011 amendment applies to prisoners confined "for a crime committed on or after October 1, 2011."  (Defendant committed his crime before the specified date.)  Defendant believes the second sentence of that subdivision creates an ambiguity that can only be resolved by applying the 2011 amendment to everyone who was confined after October 1, 2011, regardless of the date their crime was committed.  A

22

similar argument was recently addressed by our colleagues in Division Three of this court in *Rajanayagam, supra,* 211 Cal.App.4th 42.

In *Rajanayagam*, the court stated: "[W]e cannot read the second sentence to imply any days earned by a defendant *after* October 1, 2011, shall be calculated at the enhanced conduct credit rate for an offense committed before October 1, 2011, because that would render the first sentence superfluous." (*Rajanayagam, supra,* 211 Cal.App.4th at p. 51.) "Instead, [section 4019,] subdivision (h)'s second sentence attempts to clarify that those defendants who committed an offense before October 1, 2011, are to earn credit under the prior law. However inartful the language of subdivision (h), we read the second sentence as reaffirming that defendants who committed their crimes before October 1, 2011, still have the opportunity to earn conduct credits, just under prior law. [Citation.] To imply the enhanced conduct credit provision applies to defendants who committed their crimes before the effective date but served time in local custody after the effective date reads too much into the statute and ignores the Legislature's clear intent in subdivision (h)'s first sentence." (*Id.* at p. 52, fn. omitted; see also *Ellis, supra,* 207 Cal.App.4th at p. 1553 ["The second sentence does not extend the enhanced rate to any other group, but merely specifies the rate at which all others are to earn conduct credits."]; *People v. Garcia* (2012) 209 Cal.App.4th 530, 541 [the language of amended § 4019 does not entitle a defendant who was sentenced after its effective date but whose crimes occurred prior to its effective date to additional conduct credit].) We agree with the cited authorities and, therefore, reject defendant's argument.

23

Defendant next contends that applying the one-for-two credit system under former section 4019 to him while other inmates receive the benefit of the one-for-one system under the amended statute violates his right to equal protection. Similar challenges have been repeatedly rejected by the Courts of Appeal. (See *Rajanayagam, supra,* 211 Cal.App.4th at pp. 54-55; *People v. Verba* (2012) 210 Cal.App.4th 991, 994-997; *Kennedy, supra,* 209 Cal.App.4th at pp. 395-399; *Ellis, supra,* 207 Cal.App.4th at pp. 1551-1552.) The *Kennedy* and *Ellis* courts held that the defendants had failed to establish the threshold equal protection requirement that the law applies unequally to groups of *similarly situated* persons. (See *Kennedy, supra,* at pp. 396-397; *Ellis, supra,* at pp. 1551-1552.) Although the *Rajanayagam* and *Verba* courts determined that the two classes of inmates—those that committed their crimes before October 1, 2011, and those who did so on or after that date—are similarly situated for purposes of equal protection, they concluded that there are rational bases for the different treatment. (*Rajanayagam, supra,* at pp. 54-56; *People v. Verba, supra,* at pp. 996-997; see also *Kennedy, supra,* at pp. 397-399 [groups are not similarly situated, but if they are, there is a rational basis for the distinction].)

In *Verba*, the court found "several legitimate reasons for making the increased level of presentence conduct credit applicable only to those who commit their crimes on or after October 1, 2011." (*People v. Verba, supra,* 210 Cal.App.4th at p. 996.) These reasons included the following: (1) "the Legislature may have believed [that the chosen operative date] struck a proper, rational balance between the state's fiscal concerns and

its public safety interests"; (2) the Legislature has the "right to control the risk of new legislation by limiting its application"; and (3) "by tying the increased level of conduct credits to crimes committed on or after a future date, [the Legislature] was preserving the deterrent effect of the criminal law as to those crimes committed before that date." (*Id.* at p. 997; see also *Kennedy, supra,* 209 Cal.App.4th at pp. 398-399 [citing preservation of the deterrent effect of having credits determined by the date of the offense as a rational basis for the different treatment].)

In *Rajanayagam*, the court explained that in choosing October 1, 2011, as the effective date of the amendment to section 4019, "the Legislature took a measured approach and balanced the goal of cost savings against public safety. The effective date was a legislative determination that its stated goal of reducing corrections costs was best served by granting enhanced conduct credits to those defendants who committed their offenses on or after October 1, 2011. To be sure, awarding enhanced conduct credits to everyone in local confinement would have certainly resulted in greater cost savings than awarding enhanced conduct credits to only those defendants who commit an offense on or after the amendment's effective date. But that is not the approach the Legislature chose in balancing public safety against cost savings. [Citation.] Under the very deferential rational relationship test, we will not second-guess the Legislature and conclude its stated purpose is better served by increasing the group of defendants who are entitled to enhanced conduct credits when the Legislature has determined the fiscal crisis is best ameliorated by awarding enhanced conduct credit to only those defendants who

25

committed their offenses on or after October 1, 2011." (*Rajanayagam, supra,* 211 Cal.App.4th at pp. 55-56.)

If we assume defendant has established the requirement of being similarly situated to those who receive the benefit of the 2011 amendment to section 4019, we agree with the reasons given in *Rajanayagam* and *Verba* for applying the rational basis test to the amendment and their conclusions that such basis exists. Accordingly, defendant's equal protection argument is rejected.

C. *Amount of Restitution and Parole Revocation Fines*

At the time defendant committed his crime (January 2011), the minimum restitution fine and parole revocation fine that could be imposed was $200. (Former § 1202.4, subd. (b); § 1202.45, subd. (a).) The maximum was $10,000. (Former § 1202.4, subd. (b); § 1202.45, subd. (a).) By the time defendant was sentenced (in June 2012), the Legislature had raised these minimum fines to $240 (and kept the maximum at $10,000). (§ 1202.4, subd. (b), amended by Stats. 2012, ch. 868, § 3, pp. 7181-7182.)

At the sentencing hearing in this case, the court stated its "intention to . . . impose the minimum restitution fine under [sections] 1202.4 and 1202.45." When the court invited argument, each counsel stated only, "[s]ubmit." The court then imposed restitution and parole revocation fines of $240 each, and stayed the parole revocation fine. Defendant did not object.

On appeal, defendant contends the imposition of the $240 fines violate the ex post facto clauses of the United States and California Constitutions. The Attorney General

argues that defendant has waived the argument by failing to assert it below and, if not waived, it is without merit because the amounts of the fines were within the permissible range under the law in effect at the time defendant committed his crime.  We agree with the Attorney General.

Even if the court was required to impose a fine permitted only under the 2011 law, it did so.  The court's $240 fines were within the range of $200 to $10,000 permitted under the law in effect at the time of defendant's crime.  The state and federal ex post facto clauses are not implicated.  To the extent defendant believed the court erred in imposing $240 fines instead of $200 fines, he waived that claim by failing to raise it in the trial court.  (See *People v. Garcia* (2010) 185 Cal.App.4th 1203, 1218 [Fourth Dist., Div. Two].)

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
                                                                                        J.

We concur:

HOLLENHORST
          Acting P. J.

McKINSTER
                    J.

27